THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiffs-Appellee, v.
MARCUS BUCHANAN, Defendant-Appellant.

First District (1st Division) No. 1—88—0631

Opinion filed January 22, 1991.—Rehearing denied April 26, 1991.

Randolph N. Stone, Public Defender, of Chicago (Pamela Pfrang and Karen E. Tietz, Assistant Public Defenders, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, Assistant State's Attorney, and Gael M. O'Brien, Special Assistant State's Attorney, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant Marcus Buchanan was convicted of the murder of Daniel Cooper and sentenced to 40 years' imprisonment. Defendant now appeals, contending that: (1) prosecutorial misconduct during closing and rebuttal arguments denied him a fair trial; (2) the State failed to prove him guilty beyond a reasonable doubt; (3) he was denied effective assistance of counsel at trial; (4) evidence of other crimes was improp-

erly admitted at trial; (5) evidence of his gang affiliation was improperly admitted at trial; (6) the trial court erred in allowing the jury to see a police "gang photo book" at trial; (7) the judge was unaware that defendant could be sentenced under the Juvenile Court Act (Ill. Rev. Stat. 1987, ch. 37, par. 801–1 *et seq.*); and (8) the sentence was excessive. For the reasons which follow, we affirm the judgment of the trial court.

The following evidence was adduced at trial. Lewis Nieves testified that he was a former member of a street gang called the Imperial Gangsters. He had previously been in altercations with a rival gang called the Insane Unknowns. Nieves knew defendant by name due to prior gang conflicts and believed him to be a member of the Insane Unknowns. In the two weeks prior to October 31, 1986, his apartment at 3716 North Hirsch had been marked with the insignia of the Insane Unknowns. On October 28, 1986, Nieves' car had been firebombed.

Nieves further testified that at approximately 6 p.m. on October 31, 1986, he was at home with his children, who were preparing to go out trick-or-treating. Nieves had several guests at his apartment: Daniel Cooper, Dana Cooper (Daniel's identical twin), Jose Quinones, Wayne Watson and Herbert Polder. While Nieves' children remained inside, Nieves and his guests went outside to watch other children pass by in their costumes. The streetlights on Hirsch were on at this time.

Once outside, Nieves noticed a light green Citation drive slowly past his building, with two Hispanics in the front and an African-American in the rear. Nieves crossed the street to change the music playing in his car, which was slightly east of the entrance to his building. At approximately 6:40 p.m., about 40 to 50 seconds after the first sighting, the green Citation pulled in front of Nieves' building again. Through the windows of his car, he observed the man in the rear, identified in court as defendant, fire a revolver at his building from the back window of the Citation. Nieves deduced that the revolver was a .45 caliber gun from the shells he noticed later. He saw Daniel Cooper fly through the air as if he had been shot. Nieves testified that the car then hesitated for a few seconds, during which time he began to cross the street. The car then slowly drove away. Nieves stated that he then saw defendant's face, as defendant had been facing away from Nieves while shooting. He noticed that defendant was wearing a dark sweatshirt.

Nieves then saw that Daniel Cooper and Wayne Watson had been shot. Nieves called for an ambulance, which arrived 10 minutes later, along with the police. Nieves was later questioned by the police in his

apartment and was then taken to the police station. At the station, Nieves identified defendant from a book of photographs. Nieves remained at the station and identified defendant in a lineup at about 2:45 a.m. on November 1, 1986. Nieves also identified the position of cars on the street from photographs taken by the police the night of the shooting.

Jose Quinones then testified he had been across the street from Nieves' building and behind Nieves at the time the shots were fired. Quinones ducked down when he heard the shots. He could see flashes coming from the rear of the Citation; he was four or five feet from the car. Quinones heard five shots in the space of five or six seconds. After the last shot, Quinones saw the profile of the shooter as he sat back into his seat. He then saw the shooter's whole face when the shooter glanced over in Quinones' direction before the car drove away. In court, Quinones identified defendant as the shooter and stated that he had never met defendant before.

Quinones also testified that at approximately 7:30 or 8 p.m., he had also been questioned by the police in Nieves' apartment after transporting people to the hospital, but that Nieves had done most of the talking. Quinones picked defendant out of a five-man lineup at 2:45 a.m. the next day, separately from Nieves. Like Nieves, Quinones identified the position of cars on the street from photographs taken by the police the night of the shooting.

It was stipulated at trial that Daniel Cooper had a gunshot wound that went through his upper torso. It was further stipulated that the shell casings recovered from the scene were all fired from the same weapon.

Chicago police detective John Leonard testified that he learned of Daniel Cooper's death at 7:29 p.m., after interviewing Watson at the hospital. Leonard also identified the book of photographs from which Nieves had identified defendant. Finally, Leonard identified the shells recovered from the scene from a 40-foot range east and west of the entrance to Nieves' building.

Chicago police detective gang crime specialist Joseph Sparks testified that the Insane Unknowns and the Imperial Gangsters are rival gangs that belong to different "umbrella" organizations. Sparks stated that he worked in an area that marked the boundary between neighborhoods considered to be the territory of each gang. He further testified that at approximately 8:30 p.m. on October 31, 1986, he saw defendant and others in an alley about six blocks from the shooting. When Sparks and his partners pulled into the alley, defendant, whom Sparks recognized, began to walk away. Defendant ran when the po-

lice began to get out of their car, even though Sparks called defendant by name.

Sparks then testified that although he had not been looking for defendant at that time, he was looking for defendant around 10 p.m. On cross-examination, Sparks stated that it would not have been unusual for a gang member carrying marijuana to flee upon the arrival of the police.

Chicago police detective gang crime specialist Daniel Noon testified that he knew defendant and that defendant had admitted membership in the Insane Unknowns to him numerous times. Noon also testified that Nieves may not have completely retired from the Imperial Gangsters. Noon then testified that Nieves identified defendant in the photo book at about 9:30 p.m. on October 31. After this identification, Noon patrolled the areas which he knew defendant had frequented in the past. At 11:30 p.m., he observed a party at 4059 Hirsch and asked the host, Leonard, if he might enter to see if defendant was there. Leonard consented and turned the lights up and the music down while Noon moved through the party alone. Noon observed many people he recognized as members of the Latin Kings or the Insane Unknowns or their ladies. He did not see defendant and left after 5 to 10 minutes.

Noon and Sparks found defendant around 1 a.m. on November 1, 1986. Defendant was arrested and informed of his rights, then was taken to the station where he participated in lineups viewed by Nieves and Quinones. Defendant, after being informed of his rights again, gave the police a statement. Defendant stated that he did not shoot Cooper and that he was somewhere else. Defendant said that he had left his house around 6 p.m. with a woman he only knew by the name of Sharky and that they had gone to Leonard's party. Defendant said that he did not leave the party until 12:30 a.m. the next day. Noon told defendant that Sparks had seen defendant in the alley at 8:30 p.m., to which defendant replied that he ran because he was carrying marijuana on his person and that while he was in the alley, Sharky was out front. When defendant was told that Noon had been to Leonard's party, he stated that he had not seen Noon there and had kept dancing with Sharky while the police were there. Defendant did not recall whether the police he saw at the party were in uniform.

Later on November 1, 1986, defendant gave a more detailed statement which was reduced to writing by the assistant State's Attorney. Defendant stated that he was out throwing eggs at Keeler and Division from 5 to 6 p.m., went to a friend's house for 30 minutes, then went with some friends into an alley until the police arrived. He

returned to his friend's house around 8 p.m., then went to Leonard's party, where he remained until 12:30 a.m. His girlfriend Sharky had been with him the entire evening, but he did not know her full name or phone number. The statement was signed by defendant.

Dana Cooper testified that he had stopped by Nieves' apartment on October 31. His car would not start; consequently, he was looking under the hood of his car when the shots were fired. He looked up and saw that his brother had been shot. He went with his brother to the hospital, where his brother died. He did not see who fired the shots.

The State rested. Defendant introduced a stipulation that Chicago police officer Petrelli, who was unable to appear in court due to an injury, would have testified that he received a police radio call at about 6:50 p.m. on the night of the shooting. The call stated that persons on the scene had described the offenders as members of the Insane Unknowns or Latin Kings and that, based on that, the officers should be looking for four male Hispanics in a green Citation.

The defense rested. Following closing arguments, the jury was instructed. After lunch, the jury deliberated and found defendant guilty that afternoon.

On appeal, defendant first argues that a pattern of prosecutorial misconduct, particularly during closing and rebuttal argument, denied him a fair trial. We first consider whether defendant has waived the issue by failing to raise it in his written post-trial motion for a new trial. *People v. Enoch* (1988), 122 Ill. 2d 176, 186-87, 522 N.E.2d 1124, 1130-31.

■■ The only ground asserted in the written motion for a new trial that relates to the alleged error is number 9:

> "The Assistant State's Attorney made prejudicial, inflammatory and erroneous statements in closing argument designed to arouse the prejudices and passions of the jury, thereby prejudicing the defendant's right to a fair trial."

An identical allegation was held to be too vague in *People v. Sargent* (1989), 184 Ill. App. 3d 1016, 1021-22, 540 N.E.2d 981, 986-87. Consequently, the issue is waived in this case.

■■ In any event, our supreme court has repeatedly noted that "[a]ttorneys are allowed considerable leeway in making closing and rebuttal arguments" and that the scope of closing arguments falls within the discretion of the trial court. (*E.g., People v. Simms* (1988), 121 Ill. 2d 259, 269, 520 N.E.2d 308, 312.) In order to amount to reversible error, there must be a showing of substantial prejudice to

defendant's rights. *People v. Cisewski* (1987), 118 Ill. 2d 163, 175, 514 N.E.2d 970, 976.

■■ ■ Defendant contends that the State attempted to shift the burden of proof by arguing the fact that defendant did not produce witnesses on gunpowder residue tests. The record shows the State argued that it was "much easier" for the defense to argue the point without calling witnesses. However, the State may comment on defendant's failure to call a witness where such comments respond to a defense argument. (*E.g., People v. Quinn* (1988), 173 Ill. App. 3d 597, 603-04, 527 N.E.2d 905, 909.) The argument complained of here would appear to respond to defendant's argument that residue tests should have been performed; the argument therefore seems to be proper. Moreover, any error appears to have been cured by the trial court sustaining defendant's objection. See *People v. Olivas* (1976), 41 Ill. App. 3d 146, 354 N.E.2d 424.

■■ Next, defendant argues that the State improperly characterized his defense as an alibi defense. Moreover, defendant argues that the State injected Sharky and the people at the party into the case, then commented on defendant's failure to produce them. (See, *e.g., People v. Lopez* (1987), 152 Ill. App. 3d 667, 678-79, 504 N.E.2d 862, 870.) The record appears to show that these comments, like those regarding the residue test, were intended to respond to defendant's closing argument that the police were not going to look for his alibi defense, namely the girlfriend. Moreover, defendant's objection to any such mischaracterization was sustained. Consequently, these comments, like the comments on the lack of residue testing, do not appear to require a reversal, based on the record in this case.

■■ Defendant contends further that the State improperly argued that the rules of evidence prevented the State from calling the beat officer to testify as to what Nieves and Quinones told him. (See *People v. Starks* (1983), 116 Ill. App. 3d 384, 451 N.E.2d 1298.) However, in *People v. Lopez* (1980), 89 Ill. App. 3d 456, 411 N.E.2d 1071, upon which *Starks* relies, the comments to this effect stated that defense counsel was keeping the jury from hearing the evidence and that the excluded evidence supported the State's case. Here, the State argued that the jury could not hold the fact that a police officer was not called against the State because the State could not elicit hearsay testimony. Thus, it appears that the argument did not seek to prejudice defendant as did the comments in *Starks*. Rather, the remarks appear to respond to defendant's argument that this evidence had not been presented by the State. As with the earlier comments, defendant has failed to demonstrate that such argument is improper.

■ Defendant then asserts that it was improper for the State to argue material used for impeachment as substantive evidence. Defendant contends that the State argued that although Nieves and Quinones had prior convictions for "joyriding," they were better people than defendant. The record indicates that the State compared joyriding to murder. Yet the record also appears to show that this comparison was made in an attempt to diminish the negative effect of the impeachment by arguing that joyriding was not a very serious crime. As such, the argument appears to have been a proper argument on the credibility of the witnesses. See *People v. Lann* (1990), 194 Ill. App. 3d 623, 626, 551 N.E.2d 276, 280.

■ Defendant then argues that the prosecutor improperly gave the jury his personal assurance that the case was unusually strong. (See *People v. Clark* (1983), 114 Ill. App. 3d 252, 448 N.E.2d 926.) The prosecutor listed the evidence, then stated "I wish I had as much evidence in all the murder cases I try." The State contends that this comment merely responded to the defense argument that the state had not met its burden. While a similar comment was deemed improper in *Clark*, the comment does not require reversal *per se* and will be weighed with the other comments. *Clark*, 114 Ill. App. 3d at 256, 448 N.E.2d at 929.

■ Defendant argues that the State also misstated evidence in five different areas. The record indicates, however, that most of these alleged misstatements are based upon ambiguities in the evidence or are based on evidence in the record or are restatements of defendant's other arguments on appeal.

For example, defendant asserts that the prosecution improperly argued that the stipulation of Officer Petrelli's testimony, presented during the defense case, was based on the descriptions of people other than Nieves and Quinones. However, the record shows that stipulation merely refers to interviews with "several people" at the scene without naming them. Consequently, it is not possible to tell from the record whether people other than Nieves and Quinones formed the basis for the description of the offenders and their car.

Defendant argues that the State improperly argued that he was lying about his whereabouts on October 31 because he never stated that he was at Leonard's party at the time of the shooting. Yet the record shows that defendant added more details to his account of his whereabouts that evening each time the police would notify him of facts that would be inconsistent with his prior statement. Although the record does not establish that defendant is a liar, it does allow the

State to make this inference and argue it in closing. *E.g., People v. Terry* (1984), 99 Ill. 2d 508, 460 N.E.2d 746.

Defendant next argues that the State "inflated" Nieves' knowledge of defendant, but does not show how the alleged inflation, assuming it existed, affected the credibility of Nieves' repeated identifications of defendant or prejudiced his right to a fair trial. Defendant argues that the State exaggerated geographic testimony relating to the gang rivalry that allegedly motivated the shooting, but defendant fails to show that such comments, assuming them to be exaggerations, prejudiced his right to a fair trial where the record indicates prior conflicts between defendant's gang and Nieves. Defendant contends that the State improperly argued that defendant was an African-American, but this argument appears to be in response to defendant's closing argument highlighting the fact that the police were initially looking for Hispanics.

Defendant also asserts that the State argued that there were children on the street at the time of the shooting when there was no such evidence. We note on this point that the record does contain testimony that there were kids on the street at the time of the shooting.

Defendant's contention that photographs of the scene did not show the exact position of the cars at the time of the shooting does not fall into the categories above. Nonetheless, defendant fails to show how the fact that Dana Cooper's car may have moved before the photograph was taken prejudiced him in any way. Defendant's brief refers to the importance of the position of Nieves' car, not the position of Daniel Cooper's car.

Defendant also objects to portions of the prosecution's argument referring to the victim's family. The State's references to the victim's family in this case, though troublesome, do not appear to have "subject[ed] the defendant to extreme prejudice so as to warrant a reversal of his conviction." *People v. Franklin* (1976), 42 Ill. App. 3d 408, 423, 355 N.E.2d 634, 646.

Defendant finally argues that the cumulative effect of these comments mandates reversal (*e.g., People v. Estes* (1984), 127 Ill. App. 3d 642, 469 N.E.2d 275), but based on the record developed at trial, we conclude that any error in the closing arguments was harmless. *People v. Faysom* (1985), 131 Ill. App. 3d 517, 475 N.E.2d 945.

Defendant's second argument is that the State failed to prove him guilty beyond a reasonable doubt.

It is axiomatic that determinations of the credibility of witnesses and the weight to be given to their testimony are the function of the trier of fact. Mere conflicting evidence does not mandate rever-

sal, and this court will not disturb a guilty verdict unless the evidence is so improbable or unsatisfactory that it raises a reasonable doubt as to defendant's guilt. (*People v. Brandon* (1990), 197 Ill. App. 3d 866, 874, 557 N.E.2d 1264, 1269.) The relevant inquiry on appeal is whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt, after viewing the evidence in the light most favorable to the prosecution. *People v. Jimerson* (1989), 127 Ill. 2d 12, 43-44, 535 N.E.2d 889, 903.

Defendant's primary argument in this regard is that the State failed to prove that he was the offender in this case. A single witness' identification is sufficient to uphold a conviction where the identification was made in a situation allowing a positive identification. (*E.g., People v. Slim* (1989), 127 Ill. 2d 302, 537 N.E.2d 317.) In this case, there were two identification witnesses, Nieves and Quinones. Nieves testified that at the time of the offense, he had seen defendant before and knew defendant's name. The record shows that Nieves also identified defendant in a photo book and in a lineup several hours after the offense. The record further indicates that Quinones saw defendant's face and dark sweatshirt at the time of the shooting and identified defendant in a separate lineup hours thereafter. Both identified defendant at trial.

In *Brandon*, this court noted that "[a] person's name is one of the most objective and informative methods of identification available" and noted that the witness had also made identifications from a photo array and a lineup. (*Brandon*, 197 Ill. App. 3d at 875, 557 N.E.2d at 1270.) At least one witness in *Brandon*, Wright, had viewed the defendants at night. (*Brandon*, 197 Ill. App. 3d at 872, 557 N.E.2d at 1268.) It seems, therefore, that the record here supports the jury's verdict.

Defendant argues that Quinones' identification was the result of a suggestive lineup because he was the only participant wearing a dark sweatshirt. Defendant has apparently waived this issue by failing to raise it in his written post-trial motion for a new trial. (*Enoch*, 122 Ill. 2d at 186-87, 522 N.E.2d at 1130-31.) In any event, the record contains photographs representing the lineup which demonstrate that other participants in the lineup wore attire similar to that of defendant.

Defendant also argues that the testimony of the witnesses was self-contradictory and thus incredible. This point was also argued at trial. The alleged inconsistencies in the witnesses' testimony were weighed by the jury and resolved against defendant. Consequently, it appears as if defendant has failed to demonstrate that a rational trier

of fact, viewing the evidence in the light most favorable to defendant, could have found that the State failed to prove that he was the offender.

Next, we consider defendant's third contention, that the incompetence of his trial counsel denied him a fair trial as required under the sixth amendment to the United States Constitution (U.S. Const., amend. VI), requiring this cause be remanded for a new trial.

 Ineffective assistance of counsel claims are governed by a two-pronged test, announced by the United States Supreme Court in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, and adopted by our supreme court in *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246. First, counsel's performance must fall well below an objective standard of reasonableness. (*Strickland*, 466 U.S. at 687-88, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064; *Albanese*, 104 Ill. 2d at 525, 473 N.E.2d at 1255.) Second, there must be a reasonable probability that but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068; *Albanese*, 104 Ill. 2d at 525-27, 473 N.E.2d at 1255.

When applying this two-pronged test, the reviewing court will examine the totality of counsel's representation in light of all relevant circumstances and under a strong presumption of adequacy and reasonableness. (*People v. Davis* (1986), 151 Ill. App. 3d 435, 443, 502 N.E.2d 780, 785.) This inquiry typically does not encompass matters of judgment, discretion, or trial tactics and strategy, even where appellate counsel or the reviewing court might have made different decisions. (*People v. Greer* (1980), 79 Ill. 2d 103, 122, 402 N.E.2d 203, 212; *People v. Schmidt* (1988), 168 Ill. App. 3d 873, 882, 522 N.E.2d 1317, 1323.) Defendant has a right to competent, not perfect, representation. (*People v. Purnell* (1984), 126 Ill. App. 3d 608, 467 N.E.2d 1160.) Moreover, defendant cannot rely on conjecture or speculation that the verdict would have been different with better representation. *People v. Puente* (1984), 125 Ill. App. 3d 152, 465 N.E.2d 682.

Here, defendant first asserts that counsel failed to object to frequent prosecutorial misconduct at trial. The record reflects, however, that of the six examples of alleged misconduct enumerated in defendant's brief, counsel objected to four of them. Defendant then asserts that counsel failed to grasp and develop the evidence in his case. The record indicates that defense counsel cross-examined the eyewitnesses on the circumstances surrounding their viewing of defendant at the time of the offense. Defense counsel then argued in closing that given those circumstances, including the time of day and year, the position

of the witnesses and the length of time involved, the identifications were not credible. Counsel buttressed this argument with the stipulation introduced at trial that the bulletin that went out to police indicated that they should be looking for four Hispanics (which would exclude defendant, who is an African-American). Counsel also argued that the State had failed to meet its burden due to the superficial police investigation of the shooting.

All of the above would appear to fall within the scope of sound trial strategy. Defendant argues further that some evidence was not argued and that there were arguments that were not fully developed. For example, defense counsel did not argue that the placement of the spent bullet cartridges at the scene suggested that the car had not been stationary, as was described by the eyewitnesses. Defendant also states that while counsel argued in closing that the police failed to test defendant for gunpowder residue, counsel did not bring out the importance of that fact by cross-examining the State's forensic expert on this point.

Yet defendant, by raising these arguments, has merely provided the court with the conjecture that the result would have been different if these alleged deficiencies had been absent at his trial. Viewing the totality of the representation as it appears on the record, defendant has failed to demonstrate that either the representation was incompetent, rather than merely imperfect, or that the result would have been different had the arguments been made and developed. *Puente*, 125 Ill. App. 3d 152, 465 N.E.2d 682.

Defendant's fourth argument is that evidence of other crimes was improperly admitted because the State did not show that he committed or participated in said crimes. Defendant has waived the issue by failing to raise it in his written post-trial motion for a new trial. *Enoch*, 122 Ill. 2d at 186-87, 522 N.E.2d at 1130-31.

Assuming, *arguendo*, that the issues were not waived, defendant's argument fails to persuade this court. Although evidence of other crimes is inadmissible to prove a defendant's disposition to commit the crimes charged, it may be admitted if it is relevant for any other purpose and there is a similarity between the other crimes and the offense with which defendant is charged. (*People v. Evans* (1988), 125 Ill. 2d 50, 82, 530 N.E.2d 1360, 1374.) For example, evidence which goes to show motive, intent, identity, knowledge, absence of mistake, accident, common scheme or plan or *modus operandi* may also be received even though it may show the commission of a separate offense. *E.g., Evans*, 125 Ill. 2d at 82, 530 N.E.2d at 1374.

Yet these general rules concern the evidence of other crimes alleg-edly committed by a defendant, rather than evidence of crimes com-mitted by others. In this respect, the recent decision of our supreme court in *People v. Smith*, (1990), 141 Ill. 2d 40, is instructive. In *Smith*, the State attempted to prove that the defendant was a mem-ber of the King Cobra street gang and that assistant warden Virdeen Willis was murdered by defendant on behalf of Treadis Murray, who was alleged to be a leader of the King Cobras, because Willis was in-tolerant of gang activity in the prison where he worked. The evidence introduced to support the State's motive theory indicated there was gang-related activity in the Illinois penitentiary system, Willis was in-tolerant of such activity and had been in an altercation with Murray when Murray was an inmate.

The supreme court reversed the conviction and remanded for a new trial, stating:

"This evidence may well have been probative of whether defendant had a motive to kill Willis—but only if the evidence had been somehow tied to defendant. *** Th[e] evidence, by it-self, simply does not support a reasonable inference that defendant was an active member of the King Cobras, or that defendant was acting pursuant to the alleged vengeful designs of Murray or the King Cobras at the time he allegedly killed Willis. The trial record is barren of any evidence that defend-ant was aware that Willis was an assistant warden, let alone that Willis was tough on gang activity in prison. There was nothing to suggest that defendant knew Willis had had an al-tercation with Murray, or that Murray may have harbored ani-mosity toward Willis." *Smith*, 141 Ill. 2d at 58-59.

Here, the State's trial theory was that defendant's motive for the drive-by shooting was an ongoing dispute between the gang to which he belonged, the Insane Unknowns, and Nieves and the Imperial Gangsters, a rival gang to which Nieves formerly belonged. Thus, the State sought to introduce testimony that Nieves' building had been marked with Insane Unknown symbols two weeks before the shoot-ing, and that Nieves' car had been firebombed three days before the shooting. The State concedes that there is no evidence that defendant committed any crime other than the shooting.

Yet in the present appeal, unlike *Smith*, the State did present evi-dence which linked gang activity to the crime charged. The State pre-sented the testimony of Nieves and Noon that defendant was a mem-ber of the Insane Unknowns. Nieves also testified that he knew defendant from prior altercations. Moreover, the record contained evi-

dence that Nieves may not have been fully retired from the Imperial Gangsters, a gang which the record indicates is a rival of the Insane Unknowns. Therefore, defendant has failed to show that Nieves' testimony concerning the marking of his building with the insignia of the Insane Unknowns two weeks prior to the shooting and testimony concerning a feud between the Insane Unknowns and the Imperial Gangsters in Nieves' neighborhood as recent as two days prior to the shooting should have been excluded.

■■■ The firebombing incident, however, is a slightly different matter. The State has failed to point to any evidence in the record linking the firebombing to defendant or the Insane Unknowns, aside from its proximity in time and location. These factors, standing alone, are generally insufficient to support the introduction of other crimes evidence. (*People v. Lindgren* (1980), 79 Ill. 2d 129, 402 N.E.2d 238.) Nevertheless, the testimony did not provide direct evidence of defendant's participation in prior crimes; at most, there was a suggestion of criminality. Where the record otherwise supports the jury's verdict, as it does here, the introduction of such testimony was not so prejudicial as to mandate a reversal. See *People v. Robinson* (1984), 122 Ill. App. 3d 362, 367, 461 N.E.2d 493, 497.

■■■ Defendant's fifth argument is that the trial court erred in denying his motion to exclude references to his alleged gang membership at trial. The determination of whether the evidence concerning defendant's gang affiliation is admissible is primarily an inquiry into its relevance to the charges filed. (*People v. Hairston* (1970), 46 Ill. 2d 348, 372, 263 N.E.2d 840; *People v. Calderon* (1981), 98 Ill. App. 3d 657, 661, 424 N.E.2d 671.) Gang affiliation, if relevant to the crime, is generally admissible even though it may prejudice the accused. (*People v. Deacon* (1985), 130 Ill. App. 3d 280, 291, 473 N.E.2d 1354.) In such a case, the probative value of the evidence outweighs the prejudicial impact, and the trier of fact is entitled to receive such information. *People v. Rivera* (1986), 145 Ill. App. 3d 609, 618, 495 N.E.2d 1088, 1094.

Evidence of gang affiliation is relevant and admissible to show motive. (See *Rivera*, 145 Ill. App. 3d at 618, 495 N.E.2d at 1094-95; *People v. Malone* (1976), 37 Ill. App. 3d 185, 345 N.E.2d 801 (defendants had motive to shoot rival gang members).) The State's theory in this trial was that an ongoing dispute between the Insane Unknowns and Nieves, a former member of the rival Imperial Gangsters, provided the motive for the shooting. The trial record indicates that Nieves was a former or semi-retired member of the Imperial Gangsters, who were rivals of the Insane Unknowns. Nieves identified the

shooter as defendant and believed defendant to be an Insane Unknown from prior conflicts. Daniel Noon testified that defendant had admitted to him on "numerous times" that defendant was an Insane Unknown.

■ Defendant argues that *People v. Gonzalez* (1989), 188 Ill. App. 3d 559, 544 N.E.2d 1044, *appeal allowed* (1990), 128 Ill. 2d 667, 548 N.E.2d 1074, which held that a defendant's gang affiliation should have been excluded at trial, is controlling in this case. *Gonzalez*, however, differs from this case in three respects. First, in *Gonzalez*, the witness simply thought defendant was a member of a particular gang; nothing in the opinion suggests a basis for that belief. By contrast, Nieves believed defendant to be an Insane Unknown from prior dealings with him. Second, the court in *Gonzalez* noted that there was no evidence that the defendant had admitted he was a gang member (*Gonzalez*, 188 Ill. App. 3d at 566, 544 N.E.2d at 1049); here, Noon testified to such admissions. Finally, the State argued in *Gonzalez* that the witness' statement that the defendant belonged to the Spanish Cobras was admissible to prove the motive and knowledge of the investigating officer (*Gonzalez*, 188 Ill. App. 3d at 566, 544 N.E.2d at 1049); here, the evidence went to defendant's intent or motive. Therefore, given the record in this matter, defendant has failed to demonstrate that the trial court erred in admitting the evidence of gang affiliation.

Defendant's sixth contention on appeal is that he was prejudiced by the admission of the police photograph book which contained his picture among those of other street gang members. Defendant maintains that the admission of this "mug shot" book was inflammatory and not probative on the issue of identification.

■ This issue is deemed waived because of defendant's failure to raise it in his written post-trial motion. *Enoch*, 122 Ill. 2d at 186-87, 522 N.E.2d at 1130-31.

■ In any event, this court has previously held that similar evidence was admissible to show accuracy of identification (*People v. Adams* (1974), 22 Ill. App. 3d 665, 318 N.E.2d 278) and to allow the jurors to decide for themselves just how fair the photographic identification procedure had been (*People v. Bleimehl* (1972), 9 Ill. App. 3d 273, 292 N.E.2d 60). In *People v. Harrison* (1982), 106 Ill. App. 3d 341, 435 N.E.2d 1211, this court held that the admission of similar photographic evidence was not in error, where the photograph was imprinted with neither the name of the police department nor a prior date.

Here, the record suggests that the photograph book was admitted to show the jury the context in which defendant was identified by the eyewitness. Admission of the photographs was necessary to show the jury the accuracy with which the eyewitness identified defendant and to allow the jury to judge the fairness of the photographic procedure. Indeed, defendant notes in his brief that there was only one photograph of an African-American in the book—his. As defendant failed to preserve the book for the record on appeal, it was even more important that the trier of fact was able to judge the fairness of the identification procedure.

Moreover, the record suggests that the photographs of persons within the book were not matched with their names or other identifying material, as in *Harrison*, although the jury did hear that it was a police book. Moreover, although the record indicates that persons in the book were making gang "signs" with their hands, defendant has failed to demonstrate that the jury understood the meaning of these signs. Thus, defendant has failed to demonstrate that the trial court committed reversible error based on the facts and circumstances of this case.

Defendant cites *People v. Cruz* (1987), 164 Ill. App. 3d 802, 518 N.E.2d 320, in support of his argument. The videotape held inadmissible in that case, however, could not have been used for the purpose for which it was introduced and included scenes of gang violence which were previously ruled inadmissible by the trial court. (*Cruz*, 164 Ill. App. 3d at 812, 518 N.E.2d at 326.) Those factors are not present in this case; therefore, *Cruz* is inapposite to the determination of the issue here.

Defendant's seventh argument is that the cause should be remanded for resentencing because the trial court erroneously believed that the defendant had to be sentenced as an adult and could not sentence defendant under the Juvenile Court Act (Ill. Rev. Stat. 1987, ch. 37, par. 801—1 *et seq.*). Neither side disputes here that defendant could have been sentenced either under the Juvenile Court Act or under the Unified Code of Corrections (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1 *et seq.*).

A reviewing court will present that the trial court knows the law. (*People v. Gilbert* (1977), 68 Ill. 2d 252, 369 N.E.2d 849.) This presumption is rebutted only when the record affirmatively shows the contrary. *People v. Wallenberg* (1962), 24 Ill. 2d 350, 181 N.E.2d 143; *People v. Smith* (1989), 178 Ill. App. 3d 976, 984, 533 N.E.2d 1169, 1174-75.

In this case, defendant has failed to overcome this presumption. The court presumably considered the sentencing alternatives under the Juvenile Court Act. The record reflects that the trial court was aware that defendant was a juvenile; the court also refers to sending a message that persons similarly situated will end up in a "miserable adult facility," rather than "jail for a short period of time as a juvenile." The court's reference to the "stark" sentencing choices in this case appear to reflect the court's consideration (and ultimate rejection) of the State's argument that the instant offense deserved life imprisonment. Moreover, as in *Smith*, proceedings pursuant to the Juvenile Court Act were not sought by defense counsel.

■■■ ■ Defendant's final argument is that a sentence of 40 years is excessive for a teenager of his background. This court is not a sentencing court, and the sentence of a trial court will be affirmed in the absence of a clear abuse of discretion. *People v. Cox* (1980), 82 Ill. 2d 268, 275, 412 N.E.2d 541, 547; *People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882, 884.

In sentencing a defendant, the trial court may consider the gravity and circumstances of the offense, as well as defendant's mental capacity, age, demeanor and credibility. (*E.g., Perruquet*, 68 Ill. 2d at 154, 368 N.E.2d at 884.) Furthermore, the trial court must balance the objectives of protecting society and rehabilitating the defendant. (See *People v. Harris* (1989), 187 Ill. App. 3d 832, 844, 543 N.E.2d 859, 866.) Once struck, a reviewing court will hesitate to upset this balance, especially where the sentence falls within the statutory limitation. *People v. Lambrechts* (1977), 69 Ill. 2d 544, 559, 372 N.E.2d 641, 649.

Here, the court imposed a sentence of 40 years' imprisonment, which is within the guidelines of the Unified Code of Corrections for the offense of murder. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(1)(a).) The record indicates that the court considered defendant's age, educational background and prior criminal record, as well as the circumstances and gravity of the offense.

Defendant contends, however, that he was punished for remaining silent insofar as the court noted that it saw no remorse on defendant's part. It is well settled, however, that a court may properly take a lack of remorse into account in sentencing a defendant. (*People v. Barrow* (1989), 133 Ill. 2d 226, 281, 549 N.E.2d 240, 265.) In this case, as in *Barrow*, defendant chose to remain silent. (See *Barrow*, 133 Ill. 2d at 268, 549 N.E.2d at 258.) Although it is conceivable that considering lack of remorse may implicate fifth amendment considerations in certain cases (see *People v. Albanese* (1984), 102 Ill. 2d 54,

87, 464 N.E.2d 206, 222 (Simon, J., dissenting) (remorse is a mitigating factor; lack of remorse cannot be an aggravating factor where defendant asserted innocence at trial, but did not testify at sentencing hearing)), *Barrow* suggests it is not applicable in this case, particularly where, as here, defendant has failed to show that the court weighed lack of remorse in aggravation, rather than declined to weigh remorse in mitigation. Consequently, the trial court did not abuse its discretion in sentencing defendant.

For the aforementioned reasons, the judgment of the circuit court is affirmed.

Affirmed.

MANNING, P.J., and O'CONNOR, J., concur.