THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARIO DACE, Defendant-Appellant.

Fifth District    No. 5—91—0523

Opinion filed November 19, 1992.

Daniel M. Kirwan and Edwin J. Anderson, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Robert Haida, State's Attorney, of Belleville (Norbert J. Goetten and Stephen E. Norris, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE CHAPMAN delivered the opinion of the court:

On April 10, 1991, a jury convicted Mario Dace, 19, of criminal sexual assault. He was sentenced to five years in prison. On appeal he argues that (1) he was not proven guilty beyond a reasonable doubt; (2) his right to a fair trial was violated by the State's improper and inflammatory closing argument, and (3) the court improperly relied upon his continuing claim of innocence to make its sentencing decision. We reverse and remand on the second issue.

L.R., a 13-year-old girl, testified that on the evening of May 6, 1990, she walked with a friend to a nearby mailbox. As the pair approached Touchette's, a liquor store near the mailbox, they parted company. The friend crossed the street to go to the home of an acquaintance. L.R., meanwhile, saw her cousin, Clarence "Poo Poo" Anthony, standing in front of Touchette's and stopped to talk with him. It was getting dark.

L.R. told the jury that she first saw Dace when she was coming from Touchette's and her cousin finished looking at her hair. She testified that Dace put his arm around her and that she told him to get his arm off her. Anthony also told Dace to take his arm from around her. Anthony told L.R. to keep going, and she walked on to the mailbox. Anthony stayed at Touchette's, while Dace walked with her toward the mailbox.

Then, L.R. testified, Dace grabbed her, took her behind a nearby church and "stuck his thing inside [her]." She stated that Dace pulled down her clothes and that she tried to stop him. She also screamed, but Dace told her to shut up. His hands were touching her vagina as he tried to assault her. Then during the assault, his hands covered her mouth. She testified that the actual sexual assault lasted about "15 to 20 minutes" and that some "white stuff" came out of his penis while he was assaulting her.

L.R. escaped. She ran, first to the nearby house to find her friend, and when she learned that her friend was not there, she ran home. She told her mother that she had been raped. Her mother asked a neighbor to call the police. Then, L.R., her mother, her sister and her sister's boyfriend went back to Touchette's to find Dace. L.R. testified that during the assault Dace wore a red T-shirt and blue jeans. About 15 minutes later, however, when she and her family

went back to Touchette's, she stated he was clad all in white. L.R. testified that as Dace stepped out of a car, he said, "I know you." L.R. stated, [T]hen "everything went wild." Dace ran. Anthony caught him. L.R.'s sister hit Dace in the face.

Sometime later that night, hospital emergency room personnel examined L.R. She testified that the hospital staff took a blood sample and her underclothes.

L.R.'s testimony was substantially corroborated by testimony from her mother and her cousin, Anthony. Anthony testified that he saw Dace with L.R. prior to the assault. He said that when Dace put his arm around L.R., he told Dace that L.R. was too young for him. Anthony testified that about 10 to 15 minutes after that conversation, L.R.'s mother was at Touchette's looking for Dace. The defendant testified that he walked with the victim to the mailbox on the night of this incident, but he denied putting his arm around her and assaulting her.

The State also allowed L.R. to testify that she had sexual contact with her boyfriend during the seven days prior to this assault. She initially testified that she had consensual sex within three days prior to the sexual assault. However, after further questioning by the State, she stated that she had not had sex with her boyfriend for at least six or seven days prior to the sexual assault.

The State's forensic scientist, Michael Brown, testified that he identified a trace amount of semen on a vaginal smear from L.R., taken by hospital personnel on the night of the incident. He said he could not determine whether the semen was from the defendant, but he testified that the maximum amount of time after which he would still be able to locate and identify semen in a woman would be five days. He stated that typically "all the semen is cleared within three days."

The State's other witnesses were the nurse and doctor who examined L.R. in the emergency room; East St. Louis police detective James Mister, who testified about the events surrounding Dace's arrest; and East St. Louis police detective Delores Gathing, who testified she interviewed L.R. and other members of her family and that she looked for Dace.

In his own defense, Dace testified that he did not sexually assault L.R. He admitted talking to her as she walked to the mailbox May 6, 1990. After he talked to her, he assumed that she went home. Shortly after he talked to her, he testified that L.R. and her family returned to accuse him of rape.

The defense also called defendant's mother, Beverly Conwell, his brother, John Dace, and his brother's girlfriend, Shauwandra Woods. These witnesses testified that the defendant had not been wearing a red T-shirt and blue jeans on the day of the sexual assault.

The defendant first argues that he was not proven guilty beyond a reasonable doubt. He asserts that his conviction must be reversed because the State failed to sufficiently prove that he sexually assaulted L.R. Although reversing on other grounds, we must consider the defendant's challenge to the sufficiency of the evidence in order to avoid the risk of subjecting him to double jeopardy. *People v. Taylor* (1979), 76 Ill. 2d 289, 309, 391 N.E.2d 366, 375.

■■ When confronted with a challenge to the sufficiency of the evidence, it is not the function of the reviewing court to retry the defendant. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277.) Instead, all the evidence must be considered in the light most favorable to the prosecution. The reviewing court should ask whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Collins*, 106 Ill. 2d at 261, 478 N.E.2d at 277, citing *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.) A single witness' identification is sufficient to uphold a conviction where the identification was made under circumstances allowing a positive identification. (*People v. Buchanan* (1991), 211 Ill. App. 3d 305, 316, 570 N.E.2d 344, 352.) In light of these standards, the State presented sufficient evidence to support the jury's verdict finding the essential elements of criminal sexual assault beyond a reasonable doubt.

The defendant's second asserted error is that he was denied a fair trial by the prosecutor's improper and inflammatory closing argument. The State argues that the defendant has waived this argument because his post-trial motion was too vague. (*People v. Buchanan* (1991), 211 Ill. App. 3d 305, 312, 570 N.E.2d 344, 350.) In the alternative, the State argues that the prosecutor's closing arguments were proper.

In cases where the evidence is closely balanced, the supreme court has held that errors which have not been properly preserved for appeal may be considered. (*People v. Pickett* (1973), 54 Ill. 2d 280, 283, 296 N.E.2d 856, 858.) A prosecutor's improper remarks will only be considered if they are so prejudicial as to deprive the defendant of a fair trial. (*People v. Ferguson* (1988), 172 Ill. App. 3d 1, 13, 526 N.E.2d 525, 533.) The supreme court did not use the plain error doctrine in *People v. Pecoraro* (1991), 144 Ill. 2d 1, 578 N.E.2d 942, be-

cause the evidence was not closely balanced. The *Pecoraro* court noted that the defendant's version of the incident differed considerably from the prosecution witnesses' testimony.

Whether the evidence in this case is closely balanced is a key element in whether this defendant's asserted error may be considered by this court. If the evidence is not closely balanced, then the defendant has waived this argument by his failure to raise an effective objection to the argument either at trial or in his post-trial motion.

■■ The evidence in this case is closely balanced. To illustrate, L.R. first testified on direct examination that she had consensual sex within three days of the assault, but after further questioning she said the last time she had consensual sex prior to the assault was six or seven days. On cross-examination, she admitted that she "couldn't really" remember the days on which she and her boyfriend had sex. She also said she did not keep a diary.

L.R.'s testimony about the timing of her consensual sex is critical to the prosecution's case against the defendant because the trace of semen recovered from her the night of the assault could not be identified as coming from the defendant. The expert forensic scientist testified that semen could not ordinarily be found within a woman more than three days after intercourse and never more than five days. Although a trace of semen was found on L.R.'s vaginal swab, no semen was found on either her oral or anal swab. No semen was found in her underpants and none of defendant's hair was found on L.R.

At times L.R.'s testimony and that of other State witnesses differed from the content of their original statements to police. At times, the testimony of the State's witnesses was in conflict. For example, L.R. stated for the first time ever on cross-examination that (1) she knew the defendant's name before the attack but did not tell the first officer she talked to she knew her attacker's name; (2) she scratched the defendant on his penis while he was having sex with her; (3) a lady watched the defendant assault her from the kitchen window of a house behind the church; (4) the lady watching from the window only saw her running away; and (5) the defendant started running as soon as her family got to Touchette's. In addition, L.R. denied having ever said another man was present watching during the assault. However, Nurse Diane Hagelstein kept notes of her examination conversation with L.R., and she testified that L.R. did indeed say another man was there watching during the assault.

The testimony of L.R.'s mother and her cousin was also different from their original statements to police. L.R.'s cousin testified that L.R.'s blouse was ripped and buttoned upside down, but he neglected

to include that in his original statement to the police. L.R.'s mother testified that when she and her family found the defendant at Touchette's, he said he did not do anything and started to run away before they accused him of anything. These observations were not contained in her statement to the police. She did, however, tell the police that her older daughter hit the defendant in the face when she confronted him and accused him of rape.

Throughout the testimony, there are conflicting reports about the time this assault occurred. L.R. testified that she spent 30 minutes walking to the mailbox, approximately four blocks from her home. She then said that after the assault, before she went home, she stopped to look for a friend. L.R.'s mother testified that the assault occurred at about 7:30 p.m. and that it was "getting dark." L.R. testified that the assault occurred at 6 or 6:30 p.m. and that it "was dark, real dark." L.R.'s cousin testified that the assault occurred at "6:30 or so."

In view of the closeness of the case, we conclude defendant has not waived the issue of the prosecutor's closing argument. Because the testimony of the State's witnesses did not itself present a clear picture of the sexual assault, the prosecutor's closing argument was critical to convince the jury to draw the inferences necessary to convict the defendant. The prosecutor is allowed wide latitude in his closing argument (*People v. Tannahill* (1987), 152 Ill. App. 3d 882, 887, 504 N.E.2d 1283, 1287), but the prosecutor may not misstate the law. Misstatements of law in closing argument can be grounds for reversal. *People v. Crossno* (1981), 93 Ill. App. 3d 808, 821, 417 N.E.2d 827, 836.

The defendant contends that his conviction should be reversed because the prosecutor's closing argument prejudicially misstated the law. Specifically, the defendant objects to the prosecutor's argument to the jury that in order to acquit the defendant, each juror would have to tell all of the State's witnesses that they were wrong about the events to which they testified. The defendant contends that this argument is tantamount to admonishing the jury that the defendant can win only if the jury finds that each of the State's witnesses lied.

It was error in *People v. Cole* (1980), 80 Ill. App. 3d 1105, 400 N.E.2d 931, for the prosecutor to tell the jury that in order to believe the defense witnesses, the jury must find that each of the State's witnesses was lying. *Cole* considered this such a misstatement of the law that it prejudiced the defendant and denied him a fair trial. *Cole*, 80 Ill. App. 3d at 1108, 400 N.E.2d at 933.

The prosecutor's argument in *Cole* included the following statements:

> "Then you got to ask yourselves if you are going to believe *** the alibi witnesses. Is there one iota of truth in the testimony of the witnesses for the State. You have got to find that Randall Keller is lying. You got to find that Officer Tencza and Slewoski and Officer Cassata are lying. You have got to find that Investigator Gans and the other witnesses of the State are lying.
>
> Is there any reason they should lie?" *Cole*, 80 Ill. App. 3d at 1107, 400 N.E.2d at 932.

*People v. Crossno* (1981), 93 Ill. App. 3d 808, 417 N.E.2d 827, made the same observation when it considered the prosecutor's argument in rebuttal that if the jury believed the State's witnesses it must find the defendant guilty. *Crossno* held that there was no logical difference between this statement and the prejudicial statement in *Cole* because the " 'correct standard for jury consideration of evidence in a criminal case was obscured.' " *Crossno*, 93 Ill. App. 3d at 822, 417 N.E.2d at 836, quoting *United States v. Stanfield* (9th Cir. 1975), 521 F.2d 1122, 1125.

The prosecutor in *Crossno* argued in rebuttal: "[y]ou [the jury] can either believe the Defendant or you believe the [witnesses]. If you believe the Defendant, you've got to find him not guilty of everything. If you believe the other witnesses you've got to find him guilty of murder and aggravated battery." (*Crossno*, 93 Ill. App. 3d at 821, 417 N.E.2d at 836.) The court reviewed the testimony of the State's witnesses and observed that the jury could have believed the testimony of some of the State's witnesses and still could have found the defendant not guilty. (*Crossno*, 93 Ill. App. 3d at 822, 417 N.E.2d at 836.) *Crossno* held that more than the credibility of the witnesses was involved in such a statement and that the prosecutor misstated the law when he said that if the jury found the prosecution's witnesses were credible it necessitated a verdict of guilty. *Crossno*, 93 Ill. App. 3d at 822, 417 N.E.2d at 836-37.

Similarly, in *People v. Ferguson* (1988), 172 Ill. App. 3d 1, 526 N.E.2d 525, the court reversed because of the prosecutor's closing argument that to find for the defendant, the jury had to believe "that all of the persons [witnesses] *** are liars and fools." *Ferguson*, 172 Ill. App. 3d at 13, 526 N.E.2d at 533.

The prosecutor's argument in this case is cut from the same cloth as these prejudicial misstatements of the law. The specific comments which support the defendant's argument include:

"You almost have to believe detective Mister is coming here and making this story up if you want to believe the defendant. He said he didn't run. And, let's throw in detective Marion Hubbard while we're at this conspiracy to get the defendant."

It should be noted that there was no testimony from Detective Hubbard in this case, and the court sustained an objection to that comment. Other examples of objectionable comments include:

"Is the mother making all this up? Is she lying under oath to you? You think the mother is lying under oath to you about the hysterics and the shaking of her own child?

* * *

The mother, you think she is going to get up here and lie?"

Finally, the defendant points to the following argument as a serious and prejudicial misstatement of the law.

"If you want to let this defendant walk, then you make up your mind you are telling James Mister that when he testified the defendant took off running and Delbert Marion said the defendant took off running that they got it all wrong. You tell them that. And you tell the mother her daughter wasn't in hysterics. Her daughter wasn't shaking. And you tell Mike Brown that semen lasts longer than 72 hours. And you tell Detective Mister he really didn't go to that house several times like he said. And you tell them the brother of the defendant didn't let him in the house to search the house. And you tell Delores Gathing, the detective, that she didn't go there. And you tell them all not only did they not go to the house or if they went, they certainly didn't tell the family what he was wanted for. And tell them that maybe they went, but the family told them that he was in Cahokia. You think that's what happened? You would think if he is living in Cahokia, the family would say, 'Hey, he doesn't live here.' You tell all of these people they are wrong."

The prosecutor prejudicially misstated the law when he told the jury that if it wanted to find the defendant not guilty then it was telling all the State's witnesses they were wrong. In fact, as in *Cole* and *Crossno*, the jury could have believed some of the witnesses and still have believed defendant's testimony that he did not sexually assault L.R.

Detective James Mister testified that the defendant ran back into his house when the police came to arrest him. The jury did not have to believe Mister was wrong in order to believe that the defendant did not sexually assault L.R. L.R.'s mother testified that her daughter was in hysterics and shaking, but the jury did not have to disbelieve

that testimony in order to believe that the defendant did not sexually assault L.R. Forensic scientist Mike Brown testified that semen typically lasts 72 hours inside a woman's body before all traces are cleared. The jury did not have to believe that Brown was wrong in order to believe that the defendant did not sexually assault L.R. Detective Delores Gathing testified that she went to the defendant's house looking for him. The jury did not have to believe Gathing was wrong in order to believe that the defendant did not sexually assault L.R.

In fact, the jury did not have to believe that any of the witnesses listed in the prosecutor's argument were wrong in order to believe the defendant did not sexually assault L.R. Each of these witnesses testified only to the circumstances surrounding her reported rape and the defendant's subsequent arrest. The jury could have believed each of these witnesses and still have found the defendant not guilty. Because the evidence was close, the closing argument was a key to convicting the defendant. Therefore, the prosecutor's comments in closing argument, to wit, "if you want to let this defendant walk *** tell all these people [witnesses] they are wrong," were prejudicial and denied the defendant a fair trial. These comments impermissibly misstated the law and distorted the burden of proof by telling the jury, in effect, it could find the defendant not guilty only if it believed the State's witnesses were all lying or mistaken.

The defendant also complains about some of the prosecutor's comments in rebuttal. The objectionable arguments were, in essence, that if the jury found that there had been no rape in this case, how could there ever be a criminal sexual assault conviction? The defendant argues that these comments impermissibly burdened the jury with acting as representatives of the criminal justice system instead of focusing its attention on its duty as a fact finder in this particular case.

Similar remarks were held to be improper but, standing alone, not reversible error in *People v. Slaughter* (1980), 84 Ill. App. 3d 88, 97, 404 N.E.2d 1058, 1065. In *Slaughter*, the prosecutor admonished the jury that if it did not come back with a guilty verdict, no other jury "hearing a case like this could find a guy guilty." *Slaughter*, 84 Ill. App. 3d at 97, 404 N.E.2d at 1065.

The prosecutor's comments in this case included the following statements in reference to the lack of seminal fluid on L.R. to corroborate her allegations of sexual assault:

> "We don't know. The crystal ball doesn't tell us. So it's not a rape. Sorry. Next time. How is there ever going to be a criminal sexual assault case? How is there ever going to be one? Are

we going to have crowds and have cameras everywhere in the world? You can't see. This is how criminal sexual cases occur. People don't see the criminal sexual assault itself other than the victim."

These statements are improper to the extent that they admonish the jury that if it does not convict the defendant, there might never be a conviction for criminal sexual assault. Yet, as in *Slaughter*, standing alone these comments do not constitute reversible error. However, when these remarks are taken with the prosecutor's earlier misstatements of law, they further support the conclusion of prejudice to the defendant.

This case is reversed and remanded for proceedings consistent with this opinion. Because the case is reversed and remanded, we need not address the defendant's final argument challenging his sentence.

Reversed and remanded.

GOLDENHERSH, P.J., and WELCH, J., concur.