2021 IL App (1st) 172007-U

No. 1-17-2007

Order filed March 31, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit |
| | ) | Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 14 CR 2643 |
| | ) | |
| MARIO ORTEGA, | ) | Honorable |
| | ) | Timothy Joseph Joyce, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Justice Martin concurred in the judgment.
Presiding Justice Gordon dissented.

**ORDER**

¶ 1    *Held*:    The trial court did not abuse its discretion in denying defendant's pretrial request for supplementary discovery concerning the State's expert in historical cell site analysis. In addition, the State laid an adequate foundation for the expert's testimony, and defendant's trial counsel was not ineffective for failing to request a *Frye* hearing regarding the admissibility of historical cell site analysis. Finally, defendant's unpreserved claims of prosecutorial misconduct in closing argument do not constitute plain error.

¶ 2 Defendant Mario Ortega was convicted of first degree murder for the shooting death of Efrain Cruz. The evidence at trial included the testimony of an expert in the field of historical cell site analysis, who opined, based on an analysis of Ortega's cell phone records, that Ortega's cell phone was in the general vicinity of the crime scene around the time of the shooting. On appeal, Ortega challenges the expert's testimony in three respects. First, he argues that the trial court erred in denying his request for supplemental discovery regarding the expert's qualifications and training and the information, procedures, and principles on which the expert relied. Second, he argues that the State failed to lay an adequate foundation for the expert's testimony. And third, he argues that his trial counsel was ineffective for failing to request a *Frye* hearing on the admissibility of expert testimony based on historical cell site analysis. Finally, Ortega contends that the State made several improper comments in closing argument that denied him a fair trial. For the following reasons, we reject Ortega's contentions and affirm the trial court's judgment.[1]

¶ 3                                     I. BACKGROUND

¶ 4 In September 2012, Cruz and his girlfriend, Dolores Colon, lived with their two children and Cruz's mother in an apartment at 3260 West Le Moyne Street in Chicago. That address is at the corner of Le Moyne Street and Spaulding Avenue. Colon testified that she and Cruz sold small quantities of marijuana out of their apartment to friends and acquaintances.

¶ 5 On the afternoon of September 20, 2012, Ortega's girlfriend, Brianna Ruiz, and her friend, Deserie Aponte, drove to Cruz and Colon's apartment to buy marijuana. Colon initially refused to sell to them because she did not know them. However, when a boy from the neighborhood dropped

_____

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

off Colon's daughter from school, he told Colon that one of the girls was his cousin. Colon then gave the boy two bags of marijuana to take to the girls.

¶ 6    Later, as Aponte and Ruiz drove around, Ruiz received several calls from Ortega. Ortega, whose nickname is "Crazy," demanded to know where Ruiz was. Ruiz lied and said she was at home. Ruiz then texted her mother, Emily Ocasio, with whom she lived, and asked her whether Ortega was around. Ocasio looked out the window of her apartment in the area of North Avenue and Richmond Street and saw Ortega pacing back and forth while talking on the phone. Ocasio testified that Ortega was wearing a gray hoodie, white T-shirt, and blue jeans. Ortega saw Ocasio in the window and called her. He asked whether Ruiz was there, and Ocasio said she was with Aponte. Ortega told Ocasio that Ruiz had gone to buy marijuana on Le Moyne. Ocasio went outside to speak with Ortega, whom she described as irate. Ortega told Ocasio that he was going to "get" the people at Le Moyne and Spaulding. After about 15 minutes, Ocasio went back inside.

¶ 7    At some point later, Aponte and Ruiz arrived, and Ocasio came back outside. Ortega then appeared to "pop[ ] out of nowhere" and came rushing toward Ruiz, still irate. He yelled at Ruiz for lying to him about being at home. He said, "Let me find out you bought weed from that nigga Efrain, I'm going to call that nigga." Ortega also confronted Aponte. Referring to her car, he told her, "That's a nice little whip, you wouldn't like for it to be lit up." When Ocasio threatened to call the police, Ortega said that he was not scared of the police. Ortega eventually got into the front passenger seat of a red car and left.

¶ 8    Later that evening, around 9:00, Ortega went to Colon and Cruz's apartment. Colon was asleep and Cruz was not home. Cruz's mother woke Colon and told her that someone was knocking on the window. When Colon got up, she saw Ortega, whom she did not know, standing at the front

door. Ortega was wearing a gray hoodie and black jeans. He told Colon that he wanted to buy a quarter of marijuana, which was a larger amount than Cruz and Colon sold. He also asked for "E," which Colon found odd because only Cruz's friends and family called him that. Colon told Ortega that Cruz was not home, and Ortega left. Colon watched as Ortega walked across the street and got into the front passenger seat of a red car. When Cruz returned home a short time later, Ortega again appeared at the front door. Cruz introduced Ortega to Colon as "King Crazy." Cruz gave Ortega the number for the cell phone he and Colon shared, and Ortega entered the number into his phone and dialed it. Colon did not save Ortega's number in her phone's contacts.

¶ 9    Around 11:30 that evening, Colon and Cruz got a call from an unrecognized number. Cruz answered, and Colon could overhear that the male caller wanted to buy marijuana. Cruz told the caller to come to the front door, where they usually made their sales, but the caller insisted on making the transaction at the back of the building. Cruz eventually agreed and went out back. A few seconds later, Colon heard a gunshot, followed by a pause, and then four more gunshots. She ran outside to the gated area off the alley behind the apartment and found Cruz on the ground bleeding. She saw someone walking down the alley and called out "hey you," and the person then started running. The person was wearing a gray hoodie and black jeans. Colon could not see the person's face.

¶ 10    Marilyn Cintron, who lived a few buildings down on the other side of the alley, heard the gunshots and looked out the window of her basement apartment. She saw a young man running through the alley. She testified that the man was 5'5" or 5'6" and had light skin. Cintron denied telling police that the man had a medium complexion, but the parties stipulated that she had given such a description. Cintron testified that the man was wearing a gray jacket with a hoodie and dark

blue jeans. She saw the man run out of the alley and get into a four-door maroon car. Cintron testified that, before the man got into the car, he looked to his left and his right. Cintron initially testified that she was able to see the man's face for about 30 seconds, but on cross-examination she acknowledged that it was closer to one second. A few days later, a detective showed Cintron a photo array to see if she could identify the man she had seen running down the alley. Cintron selected photos of two men who she said looked alike, one of whom was Ortega. In January 2014, Cintron viewed a lineup and identified Ortega as the man she had seen running down the alley. Cintron also identified Ortega in court.

¶ 11     Herbert Chilson, who lived in the same building as Colon and Cruz, also heard the gunshots. Looking out the window of his third-floor apartment, he saw someone in a light gray hoodie and black pants open the back gate and run down the alley, but he was unable to see the person's face. Chilson called 9-1-1 and ran downstairs to render aid to Cruz. A short time later, police and paramedics arrived on the scene, and Cruz was transported to the hospital, where he was later pronounced dead. The cause of death was multiple gunshot wounds.

¶ 12     At the scene, a police evidence technician recovered three expended cartridge casings and a fired bullet. The technician also collected the doorknob assembly from the rear gate. A forensic analysis revealed that the three cartridge casings were fired from the same gun, but it could not be determined whether the recovered bullet was also fired from that gun. No fingerprints suitable for comparison were found on the doorknob. A swab collected from the doorknob tested positive for the presence of blood. Further testing identified a male DNA profile on the swab collected from the doorknob, which matched Cruz's DNA profile and did not match Ortega's DNA profile.

¶ 13    Also at the scene, Colon told the police about the phone call she and Cruz received before the shooting and gave the police her cell phone. When Colon returned home from the hospital the next day, she also told her family members about the phone call. She gave the caller's number—which she then had memorized—to her cousin, Luis Rivera, who entered the number into his phone. When Rivera did so, his phone displayed the name "King Crazy." Rivera then showed Colon a Facebook photo, and Colon recognized the person in the photo as the man who had come to her apartment before Cruz was shot, whom she again identified in court as Ortega. Colon later provided the Facebook photo to Detective Marc Leavitt.

¶ 14    Detective Leavitt received Colon and Cruz's cell phone from the officer who collected it at the scene. He examined the phone and saw that it had received a call at approximately 11:31 p.m. on September 20, 2012, from the number 773-676-3298. His investigation revealed that the phone number was registered to a Mario DeJesus, with an address of 1045 North Central Park Avenue, and that the phone had been activated on July 14, 2012. Detective Leavitt contacted the landlord at that address and learned that no one named Mario DeJesus lived there. The parties stipulated that the record keeper for a government facility in St. Charles, Illinois, would testify that, as of May 17, 2012, the facility's files listed Ortega's phone number as 773-676-3298.

¶ 15    Ortega's friend, Elisa Figueroa, testified that she was at work on the evening of September 20, 2012. Her shift was scheduled to end at 11:00 p.m. and she had arranged for Ortega to pick her up. At 11:20 p.m., she called and texted Ortega but got no response. When Ortega eventually responded, he told her that he was on his way. Figueroa went across the street and waited for Ortega at a McDonald's. When the McDonald's closed at midnight and Ortega had still not arrived, Figueroa called her aunt, who picked her up and brought her to the aunt's house at Armitage and

Kostner. While Figueroa was at her aunt's house, Ortega contacted her. Later, Ortega arrived to pick up Figueroa in a red car. Ortega was in the front passenger seat, and a man named Bryan Polanco was in the rear driver's side seat. Figueroa did not recognize the driver. Figueroa got in the rear passenger seat. As they drove around, Ortega sang along to the lyrics of a song with the line, "A killer is going to be a killer." Ortega then told Figueroa that he had shot someone. When Figueroa asked him who, Ortega said someone from Spaulding. Ortega then asked Figueroa to smell his hand. After doing so, Figueroa told Ortega that his hand smelled like bleach, and Ortega said "Yep." While still in the car, Figueroa received a call from her mother, who told her that Cruz had been shot. Her mother later called again and told her that Cruz had died. When Figueroa relayed the message that Cruz had died, Ortega laughed and said, "Oh, shit."

¶ 16    The State also called FBI Special Agent Joseph Raschke, who testified as an expert in the field of historical cell site analysis. Agent Raschke testified that he is a member of the FBI's cellular analysis survey team, which assists other investigative agencies in tracking the location of cell phones based on records maintained by cell phone companies. Agent Raschke testified that he has received more than 500 hours of classroom training from both the FBI and cell phone companies in the subjects of cellular telephone technology, radiofrequency, and cellular networks, and that he has reviewed and analyzed "thousands of [cell phone and cell site] records over hundreds of cases" and testified as an expert in historical cell site analysis approximately 75 times. He also instructs other investigators across the country in how to analyze and interpret data from cell phone company records. On cross-examination, Agent Raschke acknowledged that he is not a scientist or network engineer and has never worked for a cell phone company. He also stated his

view that historical cell site analysis is not a science and that he is not aware of any generally accepted principles or textbooks used in the field.

¶ 17    Agent Raschke explained that cell phones operate by transmitting and receiving radio-frequency signals from cell towers, which are pieces of equipment that cell phone companies place in areas in which they provide cellular service. Agent Raschke explained that cell phones are designed and programmed to utilize the cell tower that will provide the strongest, clearest signal. Agent Raschke testified that the tower providing the strongest, clearest signal will usually be the tower closest to the phone, but he acknowledged that factors such as environmental conditions or the characteristics of a particular tower may affect that calculus. Agent Raschke further explained that cell towers are often divided into different sectors, which are positioned to transmit signals in specific directions, meaning that if a cell phone utilized a sector of a cell tower that faced north, the phone could not have been located to the south of the tower. Agent Raschke testified that each cell phone company keeps a master list of where its cell towers are located, how many sectors each tower has, and the direction in which the sectors point.

¶ 18    Agent Raschke explained that cell phone companies collect and maintain historical data about the cell tower that a cell phone communicated with when it was in active use. By analyzing that data, Agent Raschke is able to determine the location of the tower and the particular sector that a phone used. That information, in turn, allows Agent Raschke to determine the general area in which a cell phone was located based on its cell tower usage. Agent Raschke emphasized that historical cell site analysis can only provide the general area in which a cell phone was located and cannot be used to place a phone at a precise address.

¶ 19    Agent Raschke testified that, using records provided by the cell phone company Cricket, he performed an historical cell site analysis for the phone number 773-676-3298. With maps that he created based on those records, Agent Raschke identified the locations and sectors of the towers that the phone used at various times on September 20, 2012. Agent Raschke testified that, between 7:02 p.m. and 7:47 p.m., the phone had multiple call activity that utilized the south-facing sector of a tower, which indicated that the phone was south of the tower and likely closer to that tower than other towers during that period. On a map, Agent Raschke identified the location of the tower and drew two lines to show the sector's southerly direction. (Agent Raschke emphasized that the upside-down V-shape produced by the lines was not meant to indicate the tower's actual coverage area.) Also identified on the map were the crime scene location and the address of 1623 North Richmond Street. Agent Raschke testified that the latter address, which was shown on the map as due south of the tower, was in the general area of the sector that the phone utilized. Agent Raschke then testified about the phone's activity from 7:54 p.m. to 8:01 p.m. and from 10 p.m. to 11:09 p.m., identifying on his maps the towers and sectors that the phone used during those periods.

¶ 20    Next, Agent Raschke testified about the phone's activity from 11:27 p.m. to 11:34 p.m. He explained that, in that eight-minute period, the phone made multiple calls that utilized one of two towers, with several instances in which the phone switched from one tower to the other in the same minute. This indicated to Agent Raschke that the phone was likely in an area where the coverage of those towers overlapped. On another map, Agent Raschke identified the towers and drew lines indicating their sector directions. The map also displayed the location of the crime scene, which Agent Raschke described as being in the "general vicinity" of where the call activity in that eight-minute period took place. Finally, Agent Raschke testified about the phone's activity

from 11:47 p.m. to 12:36 a.m. and from 12:41 a.m. to 1:09 a.m. On another map, Agent Raschke indicated the locations of the various towers and the directions of the sectors that the phone used during those periods. The map also displayed the intersection of Armitage and Kostner and showed its relative proximity to the tower that the phone used at 12:41 a.m. and 12:53 a.m.

¶ 21    On cross-examination, Agent Raschke explained that, in conducting his analysis, he relied on a list of cell tower locations provided by the cell phone company. He acknowledged that when he performed the analysis in 2014, he used a map showing the locations of Cricket's towers as of July 2012 rather than September 2012. He explained, however, that he was able to verify that the tower locations had not changed between July 2012 and September 2012 by viewing a tower list from 2014 which was identical to the July 2012 list. Agent Raschke also testified that he drove around the area of the crime scene and viewed the towers that the phone used near the time of the crime. He acknowledged that he did not measure the angles of the towers, but he explained that it was not necessary for him to do so because Cricket's tower list contained that information. He also acknowledged that he did not review the towers' maintenance records, but he explained that he never does so because the fact that a phone used the tower indicates that the tower was working.

¶ 22    Following closing arguments, the jury found Ortega guilty of first degree murder. The trial court denied Ortega's motion for a new trial and, after considering a presentence investigation report and evidence in aggravation and mitigation, imposed a sentence of 55 years in prison. After the court denied Ortega's motion to reconsider the sentence, Ortega filed a timely notice of appeal.

¶ 23                                    II. ANALYSIS

¶ 24                          A. Supplemental Discovery

¶ 25    Ortega's first argument on appeal is that the trial court erred in denying his pretrial request for supplemental discovery concerning Agent Raschke's qualifications and training in the field of historical cell site analysis and the information, standards, and procedures on which he relied when performing his analysis in this case. With respect to Agent Raschke's qualifications and training, Ortega requested a list of the requirements necessary to become an instructor in historical cell site analysis; the syllabi and training manuals used in the courses Agent Raschke attended and teaches; and the names of cases in which Agent Raschke had testified as an expert in the field. As for Agent Raschke's analysis, Ortega sought a description of the procedures, methods, scientific principles, and network information on which Agent Raschke relied in making his findings and conclusions, and any procedural manuals Agent Raschke used or developed in conducting his analysis. Ortega also requested a description of the methods Agent Raschke used to draw tower sector boundaries, an explanation of how Agent Raschke estimated tower coverage areas, and information about the operating condition of the towers and antennae on the date of the crime. Finally, Ortega sought all of Agent Raschke's case notes and the underlying raw data on which he relied, the measurement results of any field testing he conducted, and any materials supporting the scientific methodology he used, including validation studies, protocols, articles, and manuals. The trial court denied these requests, finding them overbroad and unnecessary to allow Ortega to conduct an effective defense.

¶ 26    Although Ortega recognizes that a trial court's rulings on discovery issues are generally reviewed for an abuse of discretion (see *People v. Williams*, 209 Ill. 2d 227, 234 (2004); *People v. Gomez*, 236 Ill. App. 3d 283, 292 (1992)), he urges us to review the trial court's ruling *de novo*

because (he contends) the denial of his discovery request affected his ability to effectively exercise his Sixth Amendment right to confront and cross-examine Agent Raschke. In support, Ortega cites *People v. Burns*, 209 Ill. 2d 551, 560 (2004), which held that "[t]he standard of review for determining whether an individual's constitutional rights have been violated is *de novo*." We do not quibble with that proposition, but find it inapplicable to the issue here. The crux of Ortega's argument is not that he was denied the right to confront and cross-examine Agent Raschke, but that his ability to conduct his cross-examination as effectively as he would have liked was undermined by the trial court's order denying him the requested discovery. But the constitution "guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Emphasis in original.) *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (*per curiam*). Even assuming that the trial court erred in denying Ortega's discovery request, the error did not deprive Ortega of the opportunity to cross-examine Agent Raschke about his training and qualifications as an expert in the field of historical cell site analysis or about the underlying basis for the opinions he rendered. In fact, the record reveals that Ortega was able to effectively probe what he perceived as various shortcomings in Agent Raschke's expertise and methods. Accordingly, we review the trial court's order denying Ortega's discovery request under the abuse of discretion standard generally applicable to such claims and not the *de novo* standard that is used to review alleged constitutional deprivations.

¶ 27 Discovery in criminal cases is governed, in part, by Illinois Supreme Court Rule 412. Rule 412(a) requires the State, on a defendant's request, to disclose, among other things, "any reports or statements of experts, made in connection with the particular case, including results of *** scientific tests, experiments, or comparisons, and a statement of qualifications of the expert."

Ill. S. Ct. R. 412(a)(iv) (eff. Mar. 1, 2001). In addition, Rule 412(h) states that, "[u]pon a showing of materiality to the preparation of the defense, and if the request is reasonable, the court, in its discretion, may require disclosure to defense counsel of relevant material and information not covered by this rule." Ill. S. Ct. R. 412(h) (eff. Mar. 1, 2001). By requiring certain mandatory disclosures, Rule 412(a) protects defendants "against surprise, unfairness, and inadequate preparation" and affords them "an opportunity to investigate the circumstances from which the evidence arose." *People v. Cunningham*, 332 Ill. App. 3d 233, 249 (2002). The discretionary disclosures permitted by Rule 412(h), in contrast, are "intended to have a small scope." *People v. Manley*, 19 Ill. App. 3d 365, 370 (1974). When considering a request for supplemental discovery under Rule 412(h), "it is the trial court's duty to determine the relevance and materiality of the materials [sought] and whether the request is unreasonable or oppressive." *Gomez*, 236 Ill. App. 3d at 292. Accordingly, as explained above, we will not reverse the trial court's ruling on a request for supplemental discovery under Rule 412(h) absent an abuse of discretion. *Id.*

¶ 28    We conclude that the trial court did not abuse its discretion in denying Ortega's requests. For one thing, we agree with the trial court's assessment that Ortega's requests were overbroad. Ortega's requests for information about the criteria for becoming an FBI instructor in historical cell site analysis and the syllabi and training manuals used in the courses that Agent Raschke has taught and attended went well beyond what was relevant or necessary to cross-examine Agent Raschke regarding his training and qualifications or the basis for his opinions. Ortega asserts that the trial court could have resolved the overbreadth by granting only some of his requests. But he never suggested that option in the trial court. We thus cannot say that the court abused its discretion in denying the requests *in toto.*

¶ 29    Overbreadth aside, Ortega has not shown that his supplemental discovery requests were material to an effective cross-examination of Agent Raschke. Ortega contends that information about Agent Raschke's training and the standards, methods, and information on which he relied in conducting his analysis go directly to the basis for his opinions and were thus necessary for an effective cross-examination. But Ortega does not dispute that the State tendered, pursuant to Rule 412(a)(iv), an 11-page report prepared by Agent Raschke and his *curriculum vitae*, which included a section covering his professional training and instruction in historical cell site analysis. And though Agent Raschke's report is not in the record, Ortega does not dispute the State's representation that it "describe[d] the basic principles utilized in [Agent Raschke's] analysis, the method of his analysis, [and] the information [he] utilized from the cell phone records."

¶ 30    With this information, Ortega was able to effectively probe Agent Raschke's training and qualifications as an expert in the field of historical cell site analysis and the underlying basis for his opinions. For instance, Ortega elicited that Agent Raschke is not a scientist or network engineer and that he received his college degree in accounting. Ortega also elicited Agent Raschke's view that historical cell site analysis is not a science and has no generally accepted principles or textbooks. Ortega was also able to attack what he considered various flaws in Agent Raschke's methods. For instance, he elicited that Agent Raschke relied on a list of cell towers from July 2012 rather than September 2012, when the call activity at issue took place. Ortega further elicited that Agent Raschke did not review maintenance records to confirm that the relevant cell towers were operating correctly or measure the angle of the towers.

¶ 31    Neither Ortega nor the dissent explains how additional discovery concerning Agent Raschke's training and qualifications or the scientific principles, methods, and information on

which Agent Raschke relied, beyond that which was contained in Agent Raschke's report and *curriculum vitae*, would have materially bolstered Ortega's cross-examination. The dissent's suggestion that the scientific principles and methods underlying the field of historical cell site analysis are largely exclusive to the FBI, so that Ortega's counsel could not be expected to adequately understand the basis for Agent Raschke's expert testimony without being given access to FBI manuals on the subject (see *infra* ¶¶ 90-95), is belied by the numerous scholarly articles that Ortega's appellate counsel cites which discuss (and critique) the scientific and technical underpinnings of the field.

¶ 32    In addition, we note that, while Ortega requested discovery explaining the methods Agent Raschke used to estimate tower coverage areas and draw tower sector boundaries, nothing in Agent Raschke's testimony suggests that he did either of those things. Agent Raschke testified that historical cell site analysis can be used to estimate the general area in which a cell phone was located and opined that, around the time of the crime, Ortega's phone was likely in an area where the coverage of two particular towers overlapped. But he did not offer any estimate of the towers' coverage areas. Instead, he emphasized that his opinion was only that Ortega's phone was in the "general vicinity" of the crime scene. Similarly, Agent Raschke stressed that the lines drawn on his maps indicated the directions of the relevant towers' sectors and not the towers' actual coverage areas.

¶ 33    Finally, Ortega contends that the trial court erred in denying his supplemental discovery requests because the State would have been required to tender similar information under Illinois Supreme Court Rule 417 if it had intended to present DNA evidence. But Rule 417 specifically governs discovery obligations related to DNA evidence and has no bearing outside that limited

context. For all these reasons, we cannot say that the trial court abused its discretion in denying Ortega supplemental discovery related to Agent Raschke's historical cell site analysis.

¶ 34                                   B. Foundation

¶ 35    Next, Ortega contends that the State failed to lay an adequate foundation for the admission of Agent Raschke's opinion testimony because Agent Raschke did not testify about the standards and procedures on which he relied in reaching his conclusions.

¶ 36    The parties disagree about the appropriate standard of review for this claim. Citing *People v. Safford*, 392 Ill. App. 3d 212, 221 (2009), Ortega contends that whether the proponent of expert testimony has demonstrated a sufficient foundation to establish the reliability of the expert's opinions is a question of law that is reviewed *de novo*. Ortega also cites several decisions that have followed *Safford* without providing further analysis. See *People v. Fountain*, 2016 IL App (1st) 131474, ¶ 64; *People v. Simpson*, 2015 IL App (1st) 130303, ¶ 35; *People v. Negron*, 2012 IL App (1st) 101194, ¶ 34. The State counters that *Safford*'s approach was rejected in *People v. Simmons*, 2016 IL App (1st) 131300, ¶¶ 108-114. In a thorough opinion, *Simmons* explained that *Safford*'s application of *de novo* review was inconsistent with our supreme court's repeated pronouncements that the abuse of discretion standard governs appellate review of a challenge to the foundational adequacy of an expert's testimony. *See id*. ¶ 109 (collecting cases). *Simmons* also explained that *Safford*'s reliance on the principle that *de novo* review applies where no facts are in dispute has no bearing in situations where, as here, "the trial court is asked to make determinations of reliability and sufficiency after hearing testimony." *Id.* ¶ 111. Like *Simmons*, we conclude that a trial court's ruling on the sufficiency of the foundation laid for an expert's testimony should be reviewed for an abuse of discretion.

¶ 37    "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Ill. R. Evid. 702 (eff. Jan. 1, 2011). To lay an adequate foundation for the admission of expert testimony, its proponent must establish that the witness qualifies as an expert and that the information upon which the expert relied in reaching his opinion is reliable. *Simmons*, 2016 IL App (1st) 131300, ¶ 115. The information on which an expert relies satisfies this threshold showing of reliability if it is " 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.' " *Id.* (quoting Ill. R. Evid. 703 (eff. Jan. 1, 2011)). In addition, an "expert may testify in terms of opinion or inference and give reasons therefor without first testifying to the underlying facts or data," although the expert may "be required to disclose the underlying facts or data on cross-examination." Ill. R. Evid. 705 (eff. Jan. 1, 2011); see *People v. Simpson*, 2015 IL App (1st) 130303, ¶ 37 ("Rule 705 permits an expert to give an opinion without divulging the basis for it and shifts the burden to the opposing party to elicit and to explore the underlying facts or data on cross-examination."). Once a proper foundation has been laid, an expert's testimony is admissible, but the weight to assign the testimony remains a question for the finder of fact. *Simmons*, 2016 IL App (1st) 131300, ¶ 115.

¶ 38    As noted, Ortega argues that the State failed to lay a sufficient foundation for Agent Raschke's expert opinions concerning the location of Ortega's cell phone on the date of Cruz's murder because, in Ortega's view, Agent Raschke did not explain the standards and procedures on which he based his conclusions. We disagree. Contrary to the premise of Ortega's argument, Agent Raschke testified extensively about the standards and information on which he based his opinions.

Agent Raschke testified that his conclusions about the location of Ortega's cell phone at various times on September 20, 2012, were based on his review of call records obtained for the cell phone number associated with Ortega and his knowledge of how cell phones operate by interacting with cell towers through the transmission of radiofrequency signals. Agent Raschke explained that cell phones are programmed to use the cell tower that provides the strongest, clearest signal, which is usually (although not always) the tower closest to the phone. Agent Raschke also explained that cell phone companies keep master lists of the locations of their towers and the directions in which each of the towers' sectors point, and that the companies also collect and maintain historical data about the tower and sector that its cell phones communicate with while in active use. By analyzing the data maintained by the cell phone companies, Agent Raschke explained, he is able to determine the location of the tower and the particular sector that a cell phone used when making or receiving a call, which allows him to further determine the general area in which the cell phone was located at a particular time.

¶ 39    Applying these principles, Agent Raschke created maps showing the locations of the cell towers and the directions of the particular sectors that Ortega's phone interacted with at various times on the date of the murder. For instance, based on call records showing that the phone had multiple interactions with the south-facing sector of one tower between 7:02 p.m. and 7:47 p.m., Agent Raschke opined that, during that period, the phone was located south of that tower and likely closer to that tower than any other tower. Agent Raschke further opined that the address of 1623 North Richmond Street, which was displayed on the map to the south of the tower, was in the general area of the sector that the phone utilized. Likewise, Agent Raschke testified that, between 11:27 p.m. to 11:34 p.m., the phone made multiple calls that used one of two towers, with

the phone switching several times from one tower to the other in the same minute, indicating that the phone was likely in an area where the coverage of those towers overlapped. On a map, Agent Raschke showed the location of the crime scene in relation to the location of the towers, with lines showing the directions of the sectors involved, and opined that the crime scene was in the general vicinity of where the call activity occurred.

¶ 40    Agent Raschke's testimony sufficiently explained the standards and procedures on which he relied and created an adequate foundation for his testimony as an expert. See *Fountain*, 2016 IL App (1st) 131474, ¶¶ 63-68 (rejecting similar challenge to foundation for Agent Raschke's testimony on historical cell site analysis). Ortega asks us to disregard *Fountain* because the decision there did not address the import of Agent Raschke's failure to identify the particular "network technique" on which his analysis relied. See James Beck, *et al.*, The Use of Global Positioning (GPS) and Cell Tower Evidence to Establish a Person's Location—Part II, 49 Crim. L. Bull. 637, 644 (2013) (discussing "four basic categories of techniques used to track the movements of a cellular phone"). However, even though Agent Raschke did not name the technique he used, it is clear from his testimony (as Ortega acknowledges) that he used the "cell identification" technique. That technique entails an expert reviewing call records to identify the tower and antennae (or sector) used to process a call and inferring that the phone was within the geographical coverage area of that tower and sector when the call was made. *Id.* at 645. The cited article describes the cell identification technique as "the least accurate network technique," which "can only 'pinpoint' a user's location to within 100 meters to 3 kilometers." *Id.* That description of the technique and its limitations is consistent with Agent Raschke's testimony. As discussed, Agent Raschke explained that he determined the general area in which Ortega's cell phone was

located at various times by reviewing the phone's call records and identifying the towers and sectors that the phone interacted with when making various calls. Moreover, Agent Raschke explained that his historical cell site analysis could only place a phone within a general area and not at any particular address. Agent Raschke's testimony thus adequately explained the principles on which he relied in reaching his conclusions, allowing Ortega to probe any weaknesses in his opinions on cross-examination. After a sufficient foundation for Agent Raschke's testimony was established, "any issues regarding the details [Agent] Raschke provided to support his opinion[s] *** went to the weight, not the admissibility[,] of the evidence." *Fountain*, 2016 IL App (1st) 131474, ¶ 68.

¶ 41    Ortega again relies on *Safford*, in which this court held that the State had failed to lay an adequate foundation for the expert testimony of a latent fingerprint examiner who opined that the defendant's prints matched a latent print found at the crime scene. *Safford*, 392 Ill. App. 3d at 216. We held that a foundation for the expert's opinion was lacking because the expert did not testify about the points of comparison he considered and thus failed to explain the process by which he reached his conclusion. *Id.* at 220-21, 226-28. Absent such testimony, the court held, the defendant had no real opportunity to cross-examine the expert on the basis for his opinion, leaving the jury "in the dark as to the reliability and trustworthiness of the result." *Id.* at 223.

¶ 42    We reject Ortega's reliance on *Safford*, which subsequent decisions have recognized as "'an outlier case.'" *Simmons*, 2016 IL App (1st) 131300, ¶ 123 (quoting *Negron*, 2012 IL App (1st) 101194, ¶ 41). As noted above, Agent Raschke thoroughly explained the information and principles on which he relied in reaching his opinions. Thus, unlike the expert's testimony in *Safford*, Agent Raschke's testimony did not amount to a "take my word for it." *Safford*, 392 Ill.

App. 3d at 224. To the extent that Ortega wished to elicit further details about the information or procedures on which Agent Raschke relied or highlight any flaws in his analysis, it was his "right and burden to elicit th[ose] facts *** in cross-examination." *People v. Robinson*, 2018 IL App (1st) 153319, ¶ 19 (citing Ill. R. Evid. 705 (eff. Jan. 1, 2011)). The absence of further "specificity" in Agent Raschke's testimony "simply went to the weight of his opinion," not its admissibility. *Simmons*, 2016 IL App (1st) 131300, ¶ 122.

¶ 43                                C. *Frye* Hearing

¶ 44    Ortega also contends that his trial counsel was ineffective for failing to request a *Frye* hearing on the admissibility of Agent Raschke's expert testimony regarding historical cell site analysis. To prevail on this claim, Ortega must show that his counsel's performance was deficient, meaning that it fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). He must also demonstrate that he was prejudiced by the deficiency, by showing a reasonable probability that, but for counsel's errors, the result of his trial would have been different. *Id.* at 694.

¶ 45    In Illinois, the admissibility of expert testimony based on a new or novel scientific principle or methodology is governed by the test first articulated in *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923). The test is now codified in Illinois Rule of Evidence 702, which provides that:

> "Where an expert witness testifies to an opinion based on a new or novel scientific
>
> methodology or principle, the proponent of the opinion has the burden of showing
>
> the methodology or scientific principle on which the opinion is based is sufficiently
>
> established to have gained general acceptance in the particular field in which it
>
> belongs." Ill. R. Evid. 702 (eff. Jan. 1, 2011).

"In this context, 'general acceptance' does not mean universal acceptance, and it does not require that the methodology in question be accepted by unanimity, consensus, or even a majority of experts." *In re Commitment of Simons*, 213 Ill. 2d 523, 530 (2004). "Instead, it is sufficient that the underlying method used to generate an expert's opinion is reasonably relied upon by experts in the relevant field." *Id.*

¶ 46    As noted, Ortega argues that his trial counsel was ineffective for failing to request a *Frye* hearing to determine the admissibility of Agent Raschke's expert testimony. Ortega contends that a *Frye* hearing was warranted because historical cell site analysis is based on a new or novel scientific principle or methodology that has not gained general acceptance in the relevant scientific community. But we have previously held that "testimony regarding historical cell site information [is] not the product of [a] new or novel scientific principle and methodology." *Fountain*, 2016 IL App (1st) 131474, ¶ 58; see also *People v. Williams*, 2017 IL App (1st) 142733, ¶ 39 (holding that "a *Frye* hearing was not required because the information conveyed [by Agent Raschke] is not the result of new or novel scientific principles"). Based on *Fountain* and *Williams*, we have held that defense counsel is not ineffective for failing to request a *Frye* hearing on the admissibility of such testimony. *People v. Wilson*, 2017 IL App (1st) 143183, ¶¶ 46-47.

¶ 47    As explained in *Fountain*, "the use of cell phone location records to determine the general location of a cell phone is not 'new' or 'novel' and has been widely accepted as reliable by numerous courts throughout the nation." *Fountain*, 2016 IL App (1st) 131474, ¶ 59 (collecting cases). The United States Court of Appeals for the Seventh Circuit, while expressing reservations about some uses of historical cell site analysis, has nevertheless explained that the technique "can show with sufficient reliability that a phone was in a general area, especially in a well-populated

one." *United States v. Hill*, 818 F.3d 289, 298 (7th Cir. 2016). "The science and methods upon which the technique is based," the court observed, "are understood and well documented." *Id.* at 299. In *Hill*, where "Agent Raschke emphasized that [the defendant's] cell phone's use of a cell site did not mean that [the defendant] was right at that tower or at any particular spot near that tower," the court held that it was not an abuse of discretion to admit the testimony. *Id.* at 298-99. As in *Hill*, Agent Raschke here was careful to emphasize the limits of historical cell site analysis, explaining that it can provide only the general area in which a cell phone was located based on its tower and sector usage and cannot be used to place a phone at a precise location.

¶ 48     Citing several scholarly articles, Ortega contends that there is emerging criticism in the scientific community concerning the usefulness and reliability of historical cell site analysis for tracking the location of cell phones. See Aaron Blank, The Limitations and Admissibility of Using Historical Cellular Site Data to Track the Location of A Cellular Phone, 18 Rich. J. L. & Tech. 3 (2011); James Beck, *et al.*, The Use of Global Positioning (GPS) and Cell Tower Evidence to Establish a Person's Location—Part II, 49 Crim. L. Bull. 637 (2013); Michael Cherry, *et al.*, Cell Tower Junk Science, 95 Judicature 151 (2012); Alexandra C. Smith, Pinging into Evidence: The Implications of Historical Cell Site Location Information, 120 W. Va. L. Rev. 331 (2017). But the question here is not whether to reconsider *Fountain* and subsequent decisions accepting expert testimony in historical cell site analysis without a *Frye* hearing. Instead, the question is whether Ortega's trial counsel was constitutionally deficient for not requesting a *Frye* hearing. At the time of Ortega's trial in June 2017, *Fountain* stood as binding authority that expert testimony regarding historical cell site analysis was admissible without a *Frye* hearing. *Fountain*, 2016 IL App (1st) 131474, ¶¶ 58-61. In light of the state of the law at the time, Ortega's trial

counsel did not fall below an objective standard of reasonableness by not seeking a *Frye* hearing on the admissibility of Agent Raschke's testimony. See *People v. English*, 2013 IL 112890, ¶ 35 ("counsel cannot be deemed deficient for failing to predict" changes in the law); *People v. Weninger*, 292 Ill. App. 3d 340, 345 (1997) ("Representation based on the law prevailing at the time of trial is adequate, and counsel is not incompetent for failing to accurately predict that existing law will change.").

¶ 49    Ortega argues that trial counsel should have recognized that the admissibility of expert testimony concerning historical cell site analysis was subject to challenge under *Frye* because, in 2012, the United States District Court for the Northern District of Illinois refused to allow certain expert testimony from Agent Raschke. See *United States v. Evans*, 892 F. Supp. 2d 949 (N.D. Ill. 2012). But in *Evans*, the government sought to introduce testimony from Agent Raschke that was based on a novel theory of "granulization." *Id.* at 952. When applying that theory,

> "Agent Raschke first identifies (1) the physical location of the cell sites used by the phone during the relevant time period; (2) the specific antenna used at each cell site; and (3) the direction of the antenna's coverage. He then estimates the range of each antenna's coverage based on the proximity of the tower to other towers in the area. This is the area in which the cell phone could connect with the tower given the angle of the antenna and the strength of its signal. Finally, using his training and experience, Special Agent Raschke predicts where the coverage area of one tower will overlap with the coverage area of another." *Id.*

In *Evans*, the defendant's phone used two cell towers to place nine calls in an 18-minute period of time. *Id.* The government sought to use Agent Raschke's granulization theory to prove that "the

calls made from [the defendant's] phone could have come from the location where the victim was held for ransom." *Id.* The district court ruled the testimony inadmissible, finding the granulization theory unreliable and untested. *Id.* at 956. The court explained that, "in determining the coverage overlap of the two towers used by [the defendant's] cell phone \*\*\*, Special Agent Raschke assumed that [the defendant's] cell phone used the towers closest to it at the time of the calls." *Id.* Although Agent Raschke acknowledged that certain factors could cause a cell phone to connect to a tower that was not the tower closest to it, the district court determined that Agent Raschke "did not fully account for [those factors] in his analysis" but instead "relied on his training and experience to estimate the coverage overlap between the two [towers]," without performing the scientific calculations needed to derive such estimates. *Id.*

¶ 50    Ortega's reliance on *Evans* is misplaced. As Ortega acknowledges, the granulization theory discussed in *Evans* is a more advanced methodology than what Agent Raschke used here. Unlike under the granulization theory, Agent Raschke's analysis here did not "estimate[ ] the range of each antenna's [or sector's] coverage based on the proximity of the tower to other towers in the area," nor did it "predict[ ] where the coverage area of one tower will overlap with the coverage area of another." *Id.* at 952. (While Agent Raschke testified that Ortega's phone was likely in an area where the coverage of two towers overlapped when his phone switched between the towers while making multiple calls in an eight-minute window around the time of the murder, Agent Raschke did not attempt to estimate either tower's coverage area or predict where the towers' coverage areas overlapped.) Moreover, although Agent Raschke's analysis relied on the assumption that cell phones usually connect to the cell towers that are closest to them (while acknowledging that other factors can cause a cell phone to connect with a different tower), he did

not opine that Ortega's phone was in a particular location when the calls he analyzed were made. Instead, he testified only about the general vicinity or general area in which Ortega's phone was located. As the Seventh Circuit explained in *Hill*, a decision postdating *Evans*, the methodology that Agent Raschke used to formulate that limited opinion is "sufficient[ly] reliab[le]" and the science behind it "is well understood." *Hill*, 818 F.3d at 298. Because *Evans* provides no basis for distinguishing (or reconsidering) *Fountain*'s holding that the traditional historical cell site analysis utilized here is admissible without a *Frye* hearing, Ortega's counsel cannot be deemed deficient for failing to request a *Frye* hearing regarding Agent Raschke's testimony.

¶ 51                              D. Closing Argument

¶ 52     Finally, Ortega argues that the State made several improper remarks in closing argument that either shifted the burden of proof, were not based on reasonable inferences from the evidence, or misstated the evidence. He also argues that some of the State's comments were unduly sarcastic. Ortega did not contemporaneously object to any of these comments or raise this issue in his post-trial motion, so his contentions are forfeited and may be reviewed only for plain error. *People v. Glasper*, 234 Ill. 2d 173, 203 (2009). To establish plain error, a defendant must show that a clear or obvious error occurred and that (1) the evidence was so closely balanced that the error alone threatened to tip the scales of justice against the defendant, or (2) the error was so serious that it affected the fairness of the trial and the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 53     Ortega first argues that the State misstated the law and improperly shifted the burden of proof by suggesting that the jury could only acquit him if it disbelieved the State's witnesses. Ortega takes issue with the following portions of the State's closing argument, in particular the

prosecutor's comments that the State's witnesses had no reason to lie and that there was no conspiracy against him:

"We know that those girls [Ruiz and Aponte] were telling the truth because what they told you is corroborated by people they don't even know[:] Dolores [Colon], Marilyn [Cintron]. This is not a conspiracy, ladies and gentlemen. When you have this many witnesses all giving similar facts from different perspective[s], different parts of the day, you know that that is solid evidence.

Now let's move on to Elisa Figueroa because she is a very important witness, because Elisa was a friend of the defendant, and she was with him after the murder. Elisa has no reason to come in here, make up a story, tell some kind of conspiracy theory. Elisa was afraid. She came in here, and she was quiet, but she told you some very important things.

\* \* \*

You heard from a lot of witnesses in this case who had no motive to come in here and tell a story or tell lies. There is no conspiracy against Mario Ortega. You heard the facts. You heard the truth. You heard the pieces of the puzzle, and that puzzle is solid, and there is nothing that Crazy can do about it.

The defense told you in opening that this case was based largely on rumors. But ladies and gentlemen, use your common sense. That doesn't make sense because a lot of the witnesses in this case, they don't know Mario Ortega. They don't know each other. They have no reason to come in here and testify to what they told you.

They are strangers, some of them, and then we have FBI Agent Raschke. Is

he part of the conspiracy as well? Is his analysis also part of this huge conspiracy

to frame Mario Ortega? That doesn't make sense. Your common sense will tell you

that."

¶ 54    We find no clear or obvious error in these comments. The prosecutor's remarks that the State's witnesses had no reason to lie were addressed to the issue of witness credibility, a proper subject of closing argument. See *People v. Cloutier*, 156 Ill. 2d 483, 508-09 (1993). Likewise, the prosecutor's argument that the State's witnesses were not part of a conspiracy against Ortega was a proper response to Ortega's theory, expressed in his opening statement, that the State's case was "based on rumors, circumstantial evidence and incredible witnesses." See *People v. Temple*, 2014 IL App (1st) 111653, ¶ 72 (finding no error where "the State only argued its conspiracy argument after defense counsel argued that all the State's witnesses were not credible or [were] mistaken in their testimony and the physical evidence did not corroborate the witness testimony"); *People v. Jackson*, 299 Ill. App. 3d 104, 110 (1998) (finding no error where "remarks made by the State regarding a conspiracy were in response to the defense counsel's remarks that the detectives fabricated evidence and lied to defendant" and "the State did not tell the jury that it had to believe that all the State's witnesses were lying in order to acquit defendant").

¶ 55    Ortega contends that the prosecutor's comments disclaiming any conspiracy against him improperly suggested that the jury could only acquit him if it found the State's witnesses were lying. But our supreme court has drawn "a distinction between situations where a prosecutor permissibly argues that a jury would have to believe the State's witnesses were lying in order *to believe* the defendant's version of events and where a prosecutor improperly argues that a jury

would have to believe the State's witnesses were lying in order *to acquit* defendant." (Emphasis in original.) *People v. Banks*, 237 Ill. 2d 154, 185 (2010). Here, the State did not suggest that the jury could acquit Ortega only if it found the State's witnesses were lying. Rather, its argument urged the jury to reject the defense theory that the case against Ortega was based on rumors and incredible witnesses by stressing that many of the witnesses either did not know each other or did not know Ortega and yet still consistently implicated him. That argument falls on the permissible side of the line recognized in *Banks*.

¶ 56   The prosecutor's remarks here are distinguishable from those found objectionable in other cases. In *People v. Miller*, 302 Ill. App. 3d 487 (1998), for instance, the prosecutor told the jury that it had to find that the State's witnesses were lying in order "[t]o believe that [the defendant] did not commit this murder." (Emphasis omitted.) *Id.* at 496. Similarly, in *People v. Dace*, 237 Ill. App. 3d 476, 482 (1992), the prosecutor argued "that in order to acquit the defendant, each juror would have to tell each of the State's witnesses that they were wrong about the events to which they testified." *Id.* at 482. And in *People v. Cole*, 80 Ill. App. 3d 1105, 1107 (1980), the prosecutor asked the jurors if they believed the State's witnesses were lying and suggested they could not acquit the defendant if there was "one iota of truth in the testimony of the witnesses for the State." *Id.* at 1107. The comments in these cases "improperly distorted the burden of proof by incorrectly intertwining the burden with the jury's credibility determinations." *Banks*, 237 Ill. 2d at 185. The prosecutor here did no such thing. Rather, the argument that the State's witnesses had no motive to lie and were not part of a conspiracy against Ortega was "a direct response to the defense's attack on the credibility of the State['s] witnesses and therefore 'was not a misstatement

of the law or an attempt to distort the burden of proof.'" *Temple*, 2014 IL App (1st) 111653, ¶ 74 (quoting *Banks*, 237 Ill. 2d at 185).

¶ 57    Ortega also contends that the State improperly shifted the burden of proof in its rebuttal argument, when the prosecutor stated: "I guess on behalf of the citizens of Cook County, I owe an apology to Mario Ortega and should have been looking for Bryan Polanco this whole time." The prosecutor then proceeded to explain how the evidence implicated Ortega, and not Polanco. For instance: "Bryan Polanco was seen in a gray hooded sweatshirt throughout the day. Oh, no, no, that was Mario Ortega." And: "Bryan Polanco makes threats against the guy living at Spaulding and Le Moyne saying he is going to shoot him, he is going to get him. No, no again. Mario Ortega, he did that." Like the comments above, these remarks did not suggest that the jury could only acquit Ortega if it found the State's witnesses were lying, nor did they otherwise attempt to shift the burden of proof to Ortega. Instead, these remarks properly responded to the suggestion in Ortega's closing argument that Polanco was the real culprit and that the State had not adequately investigated him.

¶ 58    Ortega further argues that the State's remarks about Polanco warrant reversal because they were unduly sarcastic. We disagree. Our supreme court has observed that "improper prosecutorial remarks," including sarcastic comments, while "all too frequent," are "completely unacceptable." *People v. Moss*, 205 Ill. 2d 139, 170-71 (2001). As this court has since recognized, however, "courts often condone sarcasm," finding reversible error only in the "rare case" where the challenged comments "indicate an extreme level of sarcasm," which "comes across *** not [as] argument [but] as ridicule and derision at its harshest" and "crosse[s] over from merely tough talk

into the realm of inflammatory rhetoric designed to improperly appeal to the juror's emotions." *In re Commitment of Gavin*, 2014 IL App (1st) 122918, ¶¶ 62-64.

¶ 59    In *Moss*, for example, the State denigrated the expert witnesses the defendant presented at the penalty phase of his capital trial as "cash for trash doctors" offering "psycho-babble" and referred to the defendant's psychiatric condition and history of brain injury as a "boo-boo to the brain." *Moss*, 205 Ill. 2d at 170. And in *Gavin*, a case in which the State sought to involuntarily commit the respondent as a sexually violent person, the prosecutor "made numerous sarcastic comments about [the respondent's] health as it relate[d] to his risk of sexual recidivism," which "ma[de] light of a serious issue at the penultimate point of the trial." *Gavin*, 2014 IL App (1st) 122918, ¶¶ 60, 62. The State's comments here come nowhere close to the extreme level of sarcasm condemned in *Moss* and *Gavin*. The comments did not ridicule or deride either Ortega, his counsel, or any witness, nor can they be characterized as inflammatory rhetoric that was likely to appeal to the jurors' emotions. Instead, as explained above, the comments were proper (albeit sarcastic) responses to Ortega's attempt in his own closing argument to cast suspicion for the murder on Polanco and question the thoroughness of the State's investigation.

¶ 60    Ortega next argues that the State made several comments that either misstated the evidence or were not based on reasonable inferences from the evidence. "A prosecutor has great latitude in closing argument and may argue fair and reasonable inferences drawn from the evidence at trial." *People v. Jackson*, 2012 IL App (1st) 102035, ¶ 18. "However, prosecutors have an ethical obligation to refrain from presenting improper and prejudicial evidence or argument" and "may not argue assumptions or facts not based upon the evidence in the record." (Internal quotation marks and citations omitted.) *People v. Porter*, 372 Ill. App. 3d 973, 978 (2007).

¶ 61    First, Ortega contends that the State suggested, without any evidentiary basis, that he threatened or tried to intimidate the witnesses against him when it described those witnesses as courageous, afraid, or scared. Ortega cites the following comments from the State's closing and rebuttal arguments, all of which we find proper. When discussing Cintron's testimony identifying Ortega as the man she saw running down the alley after the shooting, the prosecutor said that Cintron "sat right here on this witness stand and courageously pointed to [Ortega]." Later, when summarizing Figueroa's testimony about what Ortega said and did in the car following the shooting, the prosecutor prefaced her comments by remarking that "[Figueroa] was afraid. She came in here, and she was quiet, but she told you some very important things." Similarly, when referring to the State's witnesses generally, the prosecutor stated that they "came in here and did the courageous thing and told you what happened." And finally, when returning to the subject of Figueroa's testimony in rebuttal, and in the context of addressing Ortega's argument that Polanco was the actual shooter, the prosecutor commented that "Figueroa got up there, and you saw how scared she was. Scared of Bryan Polanco? Bryan Polanco wasn't here. Why would she be scared of him? She is scared of the murderer in the room, Mario Ortega."

¶ 62    In *People v. Mullen*, 141 Ill. 2d 394 (1990), where the defendant was charged with murder on a theory of accountability after his codefendant shot a man in the back, our supreme court found that the prosecution improperly suggested that witnesses were reluctant to testify out of fear that they too would be shot in the back. *Id.* at 405. The supreme court explained that the comment was improper because there was "no evidence in the record that defendant in any way threatened or intimidated any witness." *Id.* Similarly, in *People v. Rivera*, 277 Ill. App. 3d 811 (1996), this court found error in a prosecutor's remark that a witness "took his life in his own hands" by "testify[ing]

against a Latin King," where there was "no indication in the record that [the witness] feared retaliation from the Latin Kings or anyone else because of his testimony against the defendant." *Id.* at 820-21.

¶ 63    The prosecutor's comments here are distinguishable from those in *Mullen* and *Rivera*. In those cases, the prosecutor either explicitly stated or clearly implied that a witness feared that the defendant or his associates would retaliate against the witness for testifying. None of the State's remarks here can be similarly construed. For instance, the prosecutor's comments about Cintron and the State's other witnesses being courageous did not link that courage to any intimidation or threats by Ortega or anyone associated with him. Instead, those comments are most naturally read as generalized remarks about the courage any witness shows in taking the stand and testifying in a criminal case and what that courage says about the witness's credibility. See *People v. Wallace*, 100 Ill. App. 3d 424, 433 (1981) ("In noting the courage entailed in testifying in criminal cases, the prosecutor was merely arguing that the victim and [another witness] were credible witnesses" and not "attempting to suggest that defendant would attack [them] if found not guilty.")

¶ 64    Similarly, while the prosecutor's comments describing Figueroa as "afraid" and "scared" did tie her fear to Ortega, the comments did not suggest that her fear was caused by any threats or intimidation. And unlike in *Mullen* and *Rivera*, the comments were properly based on evidence in the record, such as Figueroa's demeanor on the stand and her explanation for why she did not get out of the car immediately after she began to suspect that Ortega had killed Cruz. As noted above, in prefacing its discussion of Figueroa's testimony, the State remarked that "[Figueroa] was afraid. She came in here, and she was quiet, but she told you some very important things." This comment was a clear reference to the fact that, on multiple occasions, the judge had to ask Figueroa to speak

up or repeat her answers, suggesting that she was hesitant or apprehensive. It was not improper for the State to describe this aspect of Figueroa's demeanor. See *People v. Sims*, 403 Ill. App. 3d 9, 21 (2010) (isolated comment "reflecting on the demeanor of the witnesses" is not improper); *People v. Morgan*, 259 Ill. App. 3d 770, 784 (1994) ("Demeanor of witnesses is a proper subject for closing argument."). The State's subsequent remark that Figueroa was scared of Ortega, and not Polanco, was also based on evidence in the record, specifically, Figueroa's testimony on cross-examination that she did not immediately get out of the car after learning that Cruz had been shot and hearing Ortega's unsettling reaction because she "didn't want anything to happen to [her]." Because the State's references to Figueroa's fear of Ortega was supported by evidence in the record and did not link her fear to any threats or intimidation by Ortega, we find no error.

¶ 65    We will address Ortega's remaining challenges to the State's closing argument comments together, as we find that the comments were improper but do not rise to the level of plain error. First, Ortega contends that the State misstated the evidence concerning his comments to Aponte, Ruiz, and Ocasio after he learned that Ruiz and Aponte had bought marijuana from Cruz. When discussing Aponte's testimony, the State made the following assertion: "[Aponte] told you about the threats he made. *** [J]ust hours before [Cruz] was shot three times, what did this defendant say? Let me find out that [Cruz] sold you that weed. I'll kill that nigga, his words." Likewise, when arguing that the evidence implicated Ortega, rather than Polanco, the prosecutor stated: "Bryan Polanco makes threats against the guy living at Spaulding and Le Moyne saying he is going to shoot him, he is going to get him. No, no again. Mario Ortega, he did that." Finally, the prosecutor asked the jury to "think about what [Ortega] said before the shooting. I'm gonna get him. I'm gonna kill him. Spaulding and Le Moyne."

¶ 66    We agree with Ortega that these comments misstated the evidence and cannot be deemed fair inferences from the evidence. No witness testified that Ortega said, "I'll kill that nigga." Instead, Aponte testified that Ortega said, "Let me find out you bought weed from that nigga [Cruz], I'm going *to call* that nigga." (Emphasis added.) While it would have been permissible for the State to argue, in light of Aponte's testimony about Ortega's demeanor and other surrounding circumstances, that Ortega intended to convey a threat to harm (and even kill) Cruz, the prosecutor did not ask the jury to make that inference. Instead, the prosecutor incorrectly stated that "I'll kill that nigga" were "his words." That was a misstatement of the evidence. The same is true of the prosecutor's other comments: that Ortega made "threats against the guy living at Spaulding and Le Moyne saying he is going to shoot him, he is going to get him"; and that Ortega "said before the shooting[,] I'm gonna get him. I'm gonna kill him. Spaulding and Le Moyne." Ocasio testified that Ortega threatened to "get" the people at Le Moyne and Spaulding, but neither she nor any other witness testified that Ortega explicitly threatened to "shoot" or "kill" the people. Again, it would have been fair for the State to argue that Ortega's threat to "get" the people at Le Moyne and Spaulding was meant as a threat to do them harm, but instead the State incorrectly attributed specific words to Ortega that are not found in the record.[2]

¶ 67    The State also made comments that were not based on fair inferences from the evidence when it speculated about the reasons why Figueroa smelled bleach on Ortega's hand in the car after the shooting. In the defense closing argument, Ortega's counsel argued that no physical

_____

[2] Ortega argues that these comments also misstated the evidence by conflating a threat against the people at Le Moyne and Spaulding who sold Ruiz marijuana with a direct threat against Cruz. But that was a fair inference to draw from the evidence, which established that Cruz lived at Le Moyne and Spaulding, where he sold marijuana from his apartment with Colon, and that Ortega was upset that Ruiz had gone to that location to buy marijuana from Cruz.

evidence tied Ortega to the crime, and in particular that Ortega's DNA was not found on the doorknob of the gate behind Cruz's apartment. Defense counsel later asked rhetorically, when discussing Figueroa's testimony about Ortega's hand smelling like bleach, "What does that mean?" In its rebuttal, the State responded as follows:

"[Defense counsel] talked about the door handle, and she talked about the fact Mario Ortega's DNA was not found on that door handle. That's right. You heard in the stipulation that someone's DNA in blood was found. Whose, Efrain Cruz.

Maybe that's why Mario Ortega had to put bleach on his hand, and maybe that's why his hand smelled like bleach. He was either trying to get off the gunshot residue powder from shooting the gun or [he was] trying to get off the blood on his hand, the blood that would come back to Efrain Cruz.

How do we know that that's how that blood got on the doorknob? Well, you heard from Herbert Chilson. He never saw Efrain Cruz going to that gate. Based on those injuries that you saw, you know that Efrain Cruz didn't get up and try to walk out of that gangway through the alley from the gate.

So the only person that touched that gate that transferred Efrain Cruz's blood from himself to that door handle was the defendant Mario Ortega. That's the only person you have heard so far that said their hand smells like bleach."

¶ 68    Ortega argues that these comments were not based on fair inferences from the evidence because there was no evidence that Ortega had Cruz's blood on his hands or that bleach can be used to remove gunshot residue. We partially agree. In light of Chilson's testimony that, shortly

after hearing gunshots, he looked out the window and saw a person in a light gray hoodie and black pants (clothing similar to that which Colon and Ocasio described Ortega as wearing earlier in the day) open the back gate and run down the alley, we think it is reasonable to infer from the evidence that Ortega transferred Cruz's blood to the doorknob. It was thus fair for the State to argue that Ortega's hand smelled like bleach because he used bleach to wash any trace of Cruz's blood from his hands, a common sense inference to draw from the evidence. On the other hand, there was no evidence that bleach can remove gunshot residue, nor was any testimony presented about gunshot residue at all. While prosecutors may "discuss subjects of general knowledge, common experience, or common sense in closing argument" (*People v. Beard*, 356 Ill. App. 3d 236, 242 (2005)), we do not believe the subject of gunshot residue and methods for removing it can be so characterized. It was thus improper for the State to discuss the subject without any evidentiary basis.

¶ 69     Nevertheless, we conclude that the State's improper comments do not rise to the level of plain error. As discussed above, to establish plain error, a defendant must show not only that a clear or obvious error occurred, but that (1) the evidence was so closely balanced that the error alone threatened to tip the scales of justice, or (2) the error was so serious that it affected the fairness of the trial and the integrity of the judicial process, regardless of the closeness of the evidence. *Piatkowski*, 225 Ill. 2d at 565. Ortega cannot satisfy either prong of this test.

¶ 70     First, the evidence was not closely balanced. While no physical evidence linked Ortega to Cruz's murder, the circumstantial evidence was overwhelming. Cintron testified that, after hearing gunshots, she looked out the window of her apartment and saw a man in a gray hoodie and blue jeans run out of the alley and get into car. In a pretrial lineup and at trial, Cintron identified that man as Ortega. As Ortega notes, there were several weaknesses in Cintron's identification. She

conceded that she was only able to view the man's face for about one second. She also testified that she described the man to police as having light skin, contrary to the parties' stipulation that she described him as having a medium complexion. In addition, when shown a photo array a few days after the shooting, Cintron was unable to definitively identify Ortega, instead selecting Ortega and another man who looked alike to her. If the State's case had rested heavily on Cintron's identification, then we would agree that the evidence was closely balanced in light of these flaws. But the additional evidence of Ortega's guilt—considered collectively—was itself strong.

¶ 71     Chilson, another neighbor, testified that he looked out his window after hearing gunshots and saw a person in a gray hoodie and black pants open the rear gate and run down the alley. While Chilson did not see the person's face and thus was unable to make an identification, his description of the person's attire was similar to that given by Cintron and also similar to Ocasio's and Colon's testimony about the clothing Ortega was wearing earlier that day. There was also testimony that Ortega was irate after learning that Ruiz had bought marijuana from someone at Le Moyne and Spaulding, where Colon and Cruz lived and sold marijuana, and that Ortega threatened to "call" Cruz and "get" the people at Le Moyne and Spaulding. Colon testified that Ortega later came to her apartment, asking for Cruz, and that Cruz and Ortega exchanged phone numbers. The jury also heard evidence that, minutes before the shooting, someone called Cruz using a number associated with Ortega, asking to buy marijuana but insisting that the transaction take place behind the apartment. And Agent Raschke testified that, based on an historical cell site analysis, it was his opinion that the cell phone associated with that number was in the general vicinity of the crime scene around the time of the shooting. Finally, there was Figueroa's testimony that, in the hours

after the shooting, Ortega admitted that he had shot someone from Spaulding and laughed when he heard the news that Cruz had died.

¶ 72    In light of the powerful evidence of Ortega's guilt, we cannot conclude that the evidence was so closely balanced that the State's improper comments threatened to tip the scales of justice against Ortega. And Ortega's contention that his trial counsel was ineffective for failing to object to the comments fails for the same reason. Because the evidence was not closely balanced, Ortega cannot show a reasonable probability that the result of his trial would have been different if counsel had objected to the comments. *Strickland*, 466 U.S. at 694; see *People v. White*, 2011 IL 109689, ¶ 133 (equating *Strickland*'s prejudice prong with the first prong of the plain error test).

¶ 73    The dissent contends that the State's comments that Ortega had threatened to "kill" and "shoot" Cruz—rather than "call" and "get" him—were especially likely to have affected the jury's verdict due to their repetition. See *infra* ¶ 106. But the jury was instructed more than once that the statements of attorneys in closing argument are not evidence and that it should disregard any such statement that was not based on the evidence. See Illinois Pattern Instructions, Criminal, No. 1.03 (approved July 18, 2014). It is well settled that jury instructions "carry more weight than the arguments of counsel." *People v. Boston*, 2018 IL App (1st) 140369, ¶ 103. For that reason, we have recognized that "[a] trial court's instructions that closing arguments are not evidence protect [a] defendant against any prejudice caused by improper comments made during closing arguments." *Id.* "Absent some indication to the contrary, we must presume that jurors follow the law as set forth in the instructions given them." *People v. Wilmington*, 2013 IL 112938, ¶ 49. We thus cannot conclude that Ortega was prejudiced by a handful of erroneous factual statements in the prosecution's closing argument.

¶ 74    Nor were the State's comments so serious that they affected the fairness and integrity of Ortega's trial. As explained, although the State misstated the evidence by asserting that Ortega said he would kill or shoot Cruz, the jury was likely to have inferred from Ortega's actual statements—that he was going to "call" Cruz and "get" the people at Le Moyne and Spaulding who sold marijuana to Ruiz—that he did in fact intend to shoot or kill Cruz. Likewise, while the State's argument that Ortega may have used bleach to remove gunshot residue from his hand was not based on reasonable inferences from the evidence, the jury could have reasonably inferred—as the State also urged—that Ortega used the bleach to wash Cruz's blood from his hands. Because the State's improper comments were not egregious and cannot be described as a pattern of intentional misconduct, Ortega is not entitled to relief under the second prong of the plain error test. Cf. *People v. Johnson*, 208 Ill. 2d 53, 64 (2003) (noting that "a pattern of intentional prosecutorial misconduct may so seriously undermine the integrity of judicial proceedings as to support reversal under the plain-error doctrine").

¶ 75                    III. CONCLUSION

¶ 76    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 77    Affirmed.

¶ 78    PRESIDING JUSTICE GORDON, dissenting:

¶ 79    I cannot agree with the majority's findings concerning the State's expert and the State's remarks during closing argument and, thus, I must respectfully dissent.

¶ 80    First, I find that the trial court did abuse its discretion by denying defendant's request for discovery concerning the State's expert in historical cell site analysis.

¶ 81     The majority finds that the trial court was justified in denying defendant's entire discovery request because some of the items listed were overbroad. *Supra* ¶ 28.  I cannot concur with this finding.

¶ 82     If an attorney requests a list of items, it is the trial court's job to review the list and to decide, one by one, what a party is or is not entitled to.  The majority cites no case in support of its novel proposition that, if a party is not entitled to certain items, a trial court is justified in allowing nothing in discovery.

¶ 83     Illinois Supreme Court Rule 412 provides that the State "shall" provide to the accused, "upon written motion of defense counsel," the following information regarding a State's expert witness: "any reports or statements of experts, made in connection with the particular case, including results of physical or mental examination and of scientific tests, experiments, or comparison, and a statement of qualifications of the expert."   Ill. S. Ct. R. 412(a)(iv) (eff. Mar. 1, 2001).

¶ 84     There were individual items listed in defendant's motion for expert discovery which it was an abuse of discretion to deny pursuant to this subsection of Rule 412.

¶ 85     For example, FBI Agent Raschke testified that he had previously testified as an expert approximately 75 times.  Defendant's discovery request asked for "the names of the cases where S.A. Raschke was found qualified as an expert"—not for the transcripts or reports in those cases, but simply a list of names. Defendant was entitled to this relatively short list as part of the "statement of qualifications of the expert," required by Rule 412(a)(iv).  It was not as though the expert had testified as an expert thousands of times.  In its response to defendant's discovery request, the State argued that it had provided the expert's *curriculum vitae* (CV) which should

suffice. However, the apparently out-of-date CV stated that he had testified as an expert witness 53 times, not 75, and the CV listed the court, date and month—but not the name of the case— thereby making it almost impossible for counsel to follow up on the results and the impact of his testimony in these cases. I find it was an abuse of discretion to deny defendant the names of the cases.

¶ 86    Pursuant to Rule 412(a)(iv), defendant was also entitled to the "results of physical *** examinations and of scientific tests, experiments, or comparisons." Ill. S.Ct. R. 412(a)(iv) (eff. Mar. 1, 2001). The committee comments to this subsection provide:

"In the interest of fairness paragraph (a), subparagraph (iv), requires the disclosure of *all* such results and reports, whether the result or report is 'positive,' or 'negative,' and whether or not the State intends to use the report at trial. If the State has the opportunity to view the results of any such examination the same opportunity should enure to defense counsel. No relevancy limitation is included; the only requirement is that the examination, etc. have been made 'in connection with' the case." (Emphasis added.) Ill. S. Ct. R. 412(a)(iv), Committee Comments (Oct. 1, 1971).

Thus, defendant was entitled to *all* test results, examinations, experiments and comparisons—not just the ones that were subsequently chosen by the expert to appear in his report.

¶ 87    Pursuant to subsection (iv), defendant sought "any original test results or measurements resulting from any field testing analysis conducted during his evaluation." Measurements and tests in the field certainly qualify as "physical *** examinations" and "tests, experiments and comparisons" (Ill. S. Ct. R. 412(a)(iv) (eff. Mar. 1, 2001)) and, as the comments make clear, defendant was entitled to all of them, not just the ones in the report.

¶ 88    In sum, the trial court abused its discretion by denying the entire request, merely because the request contained some overbroad items, where the request contained items whose production was required by the mandatory subsection of Rule 412, namely, Rule 412(a)(iv).[3]

¶ 89    In addition, Rule 412 has a discretionary provision that was also violated here. Rule 412(h) provides that, "[u]pon a showing of materiality to the preparation of the defense, and if the request is reasonable," the court may, "in its discretion," "require disclosure to defense counsel of relevant material and information." Ill. S. Ct. R. 412(h) (eff. Mar. 1, 2001).

¶ 90    At the hearing in the case at bar, defense counsel argued, in particular, for the FBI's procedure manual. When it became clear that the court was going to find against him, he asked for that one item. Counsel explained that the State's expert was a certified public accountant at the FBI who the FBI had trained in this area. Counsel argued that he needed the FBI procedure manual to understand what "historical cell site analysis" was, and that this information was exclusively in the hands of the FBI, which had developed this field. Counsel observed that this subject was not an academic discipline, such as DNA analysis, which was taught at a university,[4] but rather that the FBI was the sole source of relevant information.

¶ 91    At the hearing and in its written response, the State did not dispute counsel's assertions and argued instead that it had satisfied its Rule 412 obligation by producing the expert's report.

---

[3] Although the defense limits itself on appeal to arguing that the requested materials were discoverable under the discretionary provision of Rule 412, I find that certain materials were also discoverable under the mandatory provision—making them certainly discoverable under the discretionary provision as well.

[4] On cross-examination at trial, the expert admitted that this subject was neither taught at universities nor the subject of any academic textbooks.

¶ 92    In response, defense counsel argued that the report contained "one page of basic principles,"[5] and that the State could obtain the FBI procedure manual with one phone call to FBI Special Agent Raschke. Counsel argued that the manual was probably in a digital file that was easy to transmit and produce.

¶ 93    The State did not claim that production would be burdensome. In its written response, the State replied: "they can hire their own expert." However, if defendant's unrebutted claim (that all the relevant information was in the hands of the FBI) was true, then hiring an "expert" would be an empty exercise—which is exactly what counsel argued at the hearing. Counsel argued: "I need to see if he did his job right, and if his history cell site analysis is sound. You can't find it anywhere. *** The only body is the body we're asking to see their manual ***. It's the FBI. They hold the manual ***."

¶ 94    If the information concerning this field was primarily in the hands of the FBI as defendant claimed, and which the State did not dispute, then it was an abuse of discretion by the court to deny him access to this material. Without it, there was not a level playing field of information. See, *e.g.*, *People v. Perry*, 147 Ill. App. 3d 272, 276 (1986) ("Expert testimony tends to 'overpersuade in favor of the party introducing it' " (quoting *Coffey v. Hancock*, 122 Ill. App. 3d 442, 448 (1984))).

¶ 95    In his arguments, counsel explained why the manual was "relevant" (Ill. S.Ct. R. 412(h) (eff. Mar. 1, 2001)) and the trial court did not find that the manual was irrelevant or that its

---

[5] As the State observes in its brief to this court, the report itself is not in the appellate record. The State's response to defendant's motion is in the record, and its "Exh. A" contains the expert's curriculum vitae. However, its "Exh. B," which was the report, is not in the record before us.

production would be unreasonable. Instead, the trial court ruled that the whole request was overbroad. I find this was an abuse of discretion.

¶ 96    The majority writes that the dissent fails to explain how additional discovery would have aided cross-examination. *Supra* ¶ 31. Since neither we nor the majority know what was in the requested procedure manual from the expert's own agency, none of us have any idea if the expert followed it. The majority criticizes the "dissent's suggestion" that this field belongs largely to the FBI. *Supra* ¶ 31. This was not our suggestion but defendant's argument in the court below, and the State did not contend otherwise—thereby, effectively conceding the point. The majority finds that the expert did not estimate tower coverage areas. *Supra* ¶ 31. However, he opined that defendant's phone was in an area where two coverage areas overlapped—thereby, by necessity, estimating where the two coverage areas were to be found.

¶ 97    Since these claims were preserved for appeal, the State must show that the errors were harmless. Evidentiary error can be called harmless only when there is no reasonable probability that the jury would have acquitted the defendant absent the error. *In re E.H.*, 224 Ill. 2d 172, 180-81 (2006).

¶ 98    The majority finds the evidence in this case was "overwhelming." *Supra* ¶ 70.[6] The word "overwhelming" is a word too often utilized in appellate cases. A case may be "not closely balanced" but still not "overwhelming." *Supra* ¶ 69. This case is far from overwhelming.

¶ 99    Other than the expert testimony, the State's other evidence included: (1) an identification by the victim's neighbor of defendant as someone she observed fleeing down an alley after the

---

[6] Interestingly, the majority finds that the expert used " 'the least accurate *** technique' " (*supra* ¶ 40) and declines to consider whether this court should reconsider its prior acceptance of this field (*supra* ¶ 48).

offense, and whose face she observed for "one second"; (2) testimony by a detective who examined the deceased's cell phone and found that the deceased's cell phone received a call from defendant's cell phone shortly before the murder; and (3) testimony by a friend of defendant that defendant told her on the night of the offense that "[h]e shot someone" but she did not believe him. Three days after the shooting, the neighbor could not pick defendant decisively out of a photo array. Instead, she selected two photos, one of which was of defendant. Only substantially later—a full 15 months after the shooting—did she pick defendant out of a four-person lineup as the person that she observed running that night. We will never know whether she was unconsciously picking out the one person from the two photos who was also present in the four-person lineup.[7]

¶ 100   At the suppression hearing, the detective who conducted the lineup admitted that the lineup protocols of the Chicago Police Department at the time required five people in a lineup, if feasible, and to use police officers as a last resort. He conceded that all three people in the lineup, other than defendant, were Chicago police officers, and that two were from the local area—one worked "upstairs" from the detective and the other worked "downstairs" from him.

¶ 101   The lineup photo shows that defendant is the only person in blue jeans. By contrast, two of the officers sit almost like bookends in the photo, at either end of the bench, dressed in solid black—including their shoes, pants and jacket. The officer sitting next to defendant is also in dark clothes and is wearing a black sweatshirt, with a dark-grey panel in front, and dark grey pants. With the three police officers dressed in black or dark grey, the viewer's attention is drawn immediately to defendant, who is in a light grey sweatshirt that is almost a washed-out white. In

---

[7] The majority agrees that, "[i]f the State's case had rested heavily on [the neighbor's] identification, then we would agree that the evidence was closely balanced ***." *Supra* ¶ 70. However, the majority includes the expert's testimony, among other things, to find the evidence not closely balanced.

addition, the officers' hair is cropped shorter than defendant's hair. If the detective conducting the lineup had simply asked the viewer to pick out the man who looked different, he would have received the same answer.

¶ 102   Although the State is not required to prove motive, the State did offer a motive in this case. The State's evidence established that defendant was irate that his girlfriend purchased marijuana from the victim. Defendant yelled at his girlfriend: "Let me find out you bought weed from that n*** Efrain, I'm going to call that n***."

¶ 103   Based on this fairly innocuous comment by defendant that he was going to "call" the victim, the prosecutor in closing argument argued to the jury that defendant stated he was going to "kill" the victim. Specifically, the State argued that Desire Aponte, a friend of defendant's girlfriend, "told you about the threats he made. *** [J]ust hours before [the victim] was shot three times, what did this defendant say? Let me find out that [the victim] sold you that weed. I'll kill that n***, his words."

¶ 104   In case the jury missed this false statement of facts the first time, the State repeated it twice more. The State argued that defendant made "threats" against the victim, "saying he is going to shoot him." Finally, as the State ended its rebuttal closing, which is the last opportunity that any of the attorneys have to speak to the jury, the State asked the jurors: "When you go back into that jury room, I want you to think about what [defendant] said before the shooting. I'm gonna get him. I'm gonna kill him."

¶ 105   As the majority correctly finds, the State's repeated "kill" argument was a totally false statement of the facts established at trial—and, as the majority also finds, these were not the State's only misstatements during its closing argument. *Supra* ¶¶ 65-67.

¶ 106  Deliberately and repeatedly substituting the word "kill" for the fairly innocuous word "call" is not a small error in a murder case.  Repetition compounds the error.  Jurors are more likely to believe a false statement the more times they hear it repeated. See *People v. Rodriguez*, 312 Ill. App. 3d 920, 928 (2000) (" ' "a jury is more apt to believe something that is repeated" ' " (quoting *People v. Miller*, 302 Ill. App. 3d 487, 492 (1998), quoting *People v. Montgomery*, 254 Ill. App. 3d 782, 792 (1993))); Lori D. Johnson, Melissa Love Koenig, *Walk the Line: Aristotle and the Ethics of Narrative*, 20 Nevada Law Journal 1037, 1040 n.6 (Spring 2020) (subjects are more likely to believe repeated statements, regardless of whether they are true or false, and the third time they are just as likely to believe it as a true statement). The two words, "call" and "kill," almost sound the same, which could cause the jurors to doubt their own recall.  This is particularly true when the wrong word is confidently asserted by the prosecutor, who is clothed with the dignity of the State and who tells the jury that she represents the People, *ie*. them.  The prosecutor cannot be said to be drawing an inference when she asserts, as fact, that "I'll kill that n***" were defendant's own "words"—when they were not his words.  A prosecutor has a responsibility to advocate for truth and to insure a level playing field.

¶ 107  In light of the cumulative error regarding both the expert and the State's outlandishly false—and repeated—"kill" statements in closing argument, and in light of the fact that the State's case consisted of very weak, circumstantial evidence, I find that a reversal and a remand is required here.  The evidence in this case was closely balanced, and there was a reasonable probability that without these errors the jury may have acquitted defendant.  I am not confident that defendant received a fair trial.  For these reasons, I must respectfully dissent from the majority's order.